688 A.2d 28

**Dwight EVANS**

v.

**STATE of Maryland.**

**No. 159, Sept. Term 1996.**

Court of Special Appeals of Maryland.

Jan. 29, 1997.

Roland Walker (Walker & Van Bavel, P.A., Janis R. Harvey and Norman Hochberg, on the brief), Baltimore, for Appellant.

Thomas K. Clancy, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General and Patricia Jessamy, State's Attorney for Baltimore City, on the brief), Baltimore, for Appellee.

Argued before MURPHY, C.J., and MOYLAN and SONNER, JJ.

MOYLAN, Judge.

Of the small and selective list of specifically established, jealously guarded, tightly circumscribed, and well delineated exceptions to the Fourth Amendment's warrant requirement, two command our attention here. One is the oldest and most significant of them; the other is arguably the youngest and least significant.

Our first concern will be with the constitutional requirements of a search incident to lawful arrest. With respect to that exception, most of the case law has been concerned with the permitted scope, both extensive and intensive, of a search incident. Our concern in this case, however, is with the more neglected question of what is the required predicate to initiate a warrantless search incident in the first instance, regardless

of what its ultimate scope may be. The simple answer inheres in the very name of the exception itself. There is no such constitutional entity as a reasonable search incident to an *unlawful arrest*. There is no such constitutional entity as a reasonable search incident to a *non-arrest*. There is only a "search incident to a 1) *lawful* 2) *arrest*." It was of this exception that we spoke in *Franklin v. State,* 18 Md.App. 651, 664–65, 308 A.2d 752 (1973):

> One starts with the basic constitutional rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*[, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576] (1967); *Coolidge v. New Hampshire*[, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564] (1971). The most venerable of these exceptions, dating from early common law, is the universally recognized right of an arresting officer to search his arrestee as an incident of the arrest. The long debate over this exception dealt only with the breadth of the search perimeter. The exception is now fully articulated and analyzed in *Chimel v. California*[, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685] (1969).

(Citations omitted).

In case we should find that a non-arrest fatally compromised that oldest and most significant exception, the State directs our alternative attention to the rarer exception, which does not depend on the fact of an arrest. It is an exception that defies easy labeling. In *Franklin v. State,* 18 Md.App. at 665–66, 308 A.2d 752, we attempted to give it a name:

> *Cupp v. Murphy* literally defies classification in any of the preexisting pigeonholes. Though probably of limited utility, it must now join the list as an autonomous exception to the warrant requirement in its own right. Until general usage has settled upon some acceptable shorthand, the awkwardly long label for the new exception appears inevitably to be "search incident to a detention, based upon probable cause

but not amounting to arrest, for readily destructible evidence."

When we examine the search and seizure in this case under search incident theory, our attention will be on the question of *arrest versus non-arrest.* When we measure it against the *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) exception, our attention will be on the question of *highly evanescent evidence versus evidence of a more adamantine quality.*

### The Case at Hand

The appellant, Dwight Evans, was convicted by a Baltimore City jury of 1) distributing cocaine and 2) possession of cocaine with intent to distribute. On this appeal, he raises a single question:

> Whether the trial court erred when it denied his motion to suppress the evidence because the seizure of the evidence constituted an unreasonable search and seizure under the Fourth Amendment?

The appellant was but one of many individuals who became the focus of an undercover operation conducted in 1994 by the Baltimore City Police Department Violent Crimes Task Force known as "Operation Mid–East." The operation involved various city police officers who identified street-level drug dealers by making "controlled buys" from them. A lone officer would first proceed to a target area dressed in plain clothes and attempt to make a controlled buy by offering a suspect marked currency in return for the narcotics. Once the transaction was complete, the officer, wearing a body wire, would transmit a description of the suspect to an "identification team" composed of other officers from the task force who were located in close proximity to the undercover officer. At that point, the identification team would locate and detain the suspect. The suspect would be searched, any narcotics or

currency found would be seized,[1] the suspect would be photographed,[2] his address would be verified,[3] and he would then be released. A "technical team" would also be on hand to videotape the transaction and to maintain communication with the officer throughout the operation. The procedures followed for "Operation Mid–East" were identical regardless of the amount of narcotics recovered from a suspect.

"Operation Mid–East," which continued for approximately one month, culminated on a designated "hit day" when the task force returned to the target area and made a mass arrest of some sixty individuals, including the appellant, who had been the sellers in the previous controlled buys. According to the officers, the arrests were not effectuated individually at the time the controlled buys were made because the officers feared that, if done on an individual basis, "information about the arrests would leak out and endanger the future of the undercover operation." Furthermore, the purpose of "Operation Mid–East" was to "make a major impact on the area," and would therefore only be effective if a mass arrest were executed.

The appellant himself was ensnared by "Operation Mid–East" when, during the evening hours of June 9, 1994 in the area of Monument and Milton Streets, he sold $10 worth of cocaine to Officer Kenneth Rowell, an undercover officer participating in the operation. Officer Rowell testified that he approached the appellant and asked him "if he was working," to which the appellant responded that he had "dimes of coke." After Officer Rowell expressed an interest in the narcotics, the

---

1. The officers would separately photograph any marked currency in the suspect's possession in order to show that it was recovered.

2. According to testimony of one of the officers, the suspect was photographed so that he could not later claim that he was not the individual detained by the police.

3. In order to verify the suspect's address, the identification team would call the suspect's home and request a description of the suspect from the individual who answered the phone as well as confirmation that the suspect did in fact reside at that address.

two walked a short distance, Officer Rowell produced a marked ten dollar bill, and the appellant "reached into his rear end, down inside his pants" and proceeded to hand the officer a vial of cocaine.

At that point, Officer Rowell walked away from the appellant and transmitted a description of him to the technical team. The officer returned to his vehicle and once again transmitted a description of the appellant over his two-way police radio. Approximately five to ten minutes later, Officer Rowell received confirmation from the technical team that a man fitting the appellant's description had been stopped. Officer Rowell then drove past the scene and by radio transmission confirmed the identification of the appellant as the man who sold him the cocaine.[4]

After the appellant was stopped, the officers proceeded to photograph him, tell him that they were conducting an investigation, search him, give him a receipt for the currency which had been seized, and verify his identification.[5] The initial search that was conducted by the officers produced $163 in currency. Because the officers were initially unable to find any narcotics, they contacted Officer Rowell to inquire as to where the appellant had hidden the narcotics. After being told that the appellant had taken the narcotics from his "rear area," one of the officers performed a rectal search of the appellant and recovered, one by one, nine glass vials of cocaine.[6]

---

**4.** Apparently, Officer Rowell proceeded to the scene personally to identify the appellant because the appellant did not appear on the videotape.

**5.** The appellant's father arrived to verify the identification information given to the officers by the appellant.

**6.** Notwithstanding the fact that the appellant devotes the major portion of his effort both in appellate brief and at oral argument to the extreme intrusiveness of the body cavity search, we give that fact no consideration whatsoever. In reviewing the ruling on the suppression motion, our examination looks only at the evidence before the court at the hearing on that motion. *Trusty v. State*, 308 Md. 658, 670–72, 521 A.2d 749 (1987); *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990).

### The Suppression Hearing

Prior to trial, the appellant moved to exclude the narcotics as well as the currency on the ground that the search for and seizure of them violated the Fourth Amendment. He maintained that because he had not been arrested at the time of the search and seizure, the warrantless search could not be sustained as a search incident to lawful arrest. The State, on the other hand, maintained that because the officers had had probable cause to arrest the appellant at the time the search was conducted, it was nevertheless a search incident to the appellant's arrest, even though the arrest did not occur until approximately one month later.

On hearing the evidence, the trial judge denied the appellant's motion to suppress. In giving alternative theories for its ruling, the trial court first found that the search of the appellant, was, in fact, incident to an arrest: "Well, despite the fact that you're saying this is not incident to an arrest, everything that I've heard on this record is that this is a search incident to an arrest[.]" After detailing the circumstances surrounding the search and seizure, the trial court found:

Now, the fact that they elected not to process the arrest to completion doesn't change the fact that it was an arrest.

And I think that your use and the officer's use of the word "arrest" is a word of art at this point because basically it was a detention and the defendant was not free to go until they secured his identification. So, it really was, in fact, an arrest for Fourth Amendment purposes.

For Fourth Amendment purposes, its not necessary that he be taken to the District Court Commissioner, given a Statement of Charges, and sent to a commissioner for processing for, for bail in order for it to be an arrest.

The testimony at that hearing neither mentioned nor alluded to the rectal search. That circumstance was only revealed at the trial on the merits. Absent any request to the trial judge to reopen the suppression issue, such evidence does not exist for purposes of our review of the Fourth Amendment question.

In the alternative, the court, explicitly relying on *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) and *Franklin v. State,* 18 Md.App. 651, 308 A.2d 752 (1973), found that the narcotics and currency was of such an "evanescent" character as to permit the warrantless search:

> I find under the circumstances here that this was an arrest and, in the event that it wasn't an arrest, *that it was a detention for the purpose of getting the evanescent evidence which is the stash and the money, which would have been gone if they had at that time decided to get an arrest warrant and arrest him some time later.*

(Emphasis supplied).   The motion to suppress was denied.

### *Search Incident to Lawful Arrest: Was There An Arrest?*

The State does not seriously argue that there could be a reasonable search incident to a non-arrest.   It recognizes that a *Cupp v. Murphy* search, triggered by probable cause to make an arrest but not requiring the actual arrest itself, is confined to a search for highly evanescent evidence.   Indeed, the *Cupp v. Murphy* opinion, 412 U.S. at 296, 93 S.Ct. at 2004, makes it very clear that notwithstanding 1) the undisputed existence of probable cause for an arrest and 2) the physical seizure and non-consensual search of the person of Murphy, a full-blown search incident to lawful arrest according to *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), would not have been permitted:

> [W]e do not hold that a full *Chimel* search would have been justified in this case without a formal arrest and without a warrant.

In *Franklin v. State,* this Court authorized a warrantless search and seizure under the guidelines of *Cupp v. Murphy.* In describing that aspect of Fourth Amendment law, we made it clear, 18 Md.App. at 666, 308 A.2d 752, special limitations applied that would not inhibit a search incident to lawful arrest, had a true search incident been justified:

> The initial critical element in *Cupp v. Murphy,* as in the case at bar under the present assumption, is that there was

no arrest. Had there been an arrest, the case would have been routinely pedestrian.... The search would have been permitted whether the intrusion was fleeting or protracted and whether the evidence was evanescent or enduring. *The unavailability of classic "search incident" justification was because of the fact that Murphy was never arrested.*

(Emphasis supplied).

The thrust of the State's argument is that although the appellant may not have been formally arrested until a month later, he was actually arrested on the evening of June 9. It argues that when the police stopped the appellant, photographed him, searched him, and interrogated him that evening, there was, for Fourth Amendment purposes, a seizure of the person. We completely agree. *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). It further argues that the police intrusion on the appellant's freedom of movement was significantly greater than the limited detention and limited "pat-down" permitted by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). Again, we agree.

At that point, however, the State's argument takes a tack we cannot follow. It argues that because the only *legitimate* warrantless seizure of the person that is more intrusive than a *Terry* stop is a probable-cause-based arrest, it necessarily follows that every actual seizure of the person that is more intrusive than a *Terry* stop is *ipso facto* an actual arrest. From that, the State argues that we should accept the fact of arrest as a given and then simply proceed to determine whether there was sufficient probable cause to justify it.

Every restraint on a citizen that is more intrusive than a *Terry* stop for purposes of a defendant's proving a Fourth Amendment violation, however, does not necessarily establish the fact of an arrest when the State seeks to use it to prove Fourth Amendment satisfaction. A police intrusion may be "tantamount to an arrest" or "the functional equivalent of an arrest" so as to permit the aggrieved citizen to claim a

constitutional tort under § 1983, to establish custody so as to be entitled to *Miranda* warnings, to invoke the "fruit of the poisonous tree" doctrine to suppress the *sequelae* of that intrusion, etc. A degree of intrusiveness "beyond *Terry*," however, does not necessarily mean that the State has satisfied the arrest requirement when it seeks to justify the intrusion on the basis of an arrest.

All of the cases cited by the State involve, to be sure, intrusions that go beyond *Terry*. They are cases, however, invoked by an aggrieved defendant seeking to prove a Fourth Amendment violation, not cases relied on by the State to establish Fourth Amendment justification. The importance of that distinction has been pointed out by Wayne R. LaFave, 3 *Search and Seizure: A Treatise on the Fourth Amendment* § 5.1(a) at 10 (3d ed. 1996):

> It is important to note ... that the question of when an arrest occurred cannot be answered in the abstract, that is, without consideration of why the question is being asked. Courts do (and, indeed, should) take a somewhat different approach when it is the *prosecution* which is contending that an arrest was made at a particular time, so as to justify a search which presumably can be undertaken as a matter of constitutional or statutory law only subsequent to arrest.

(Emphasis in original; footnote omitted).

Although the Supreme Court discussions of this aspect of search incident law have been skimpy (the almost exclusive focus has been on the permitted scope of a search incident), the limited references that have been made insist not only on the fact of a formal arrest as the indispensable predicate for a search incident to lawful arrest but also insist that the arrest be "custodial" in nature and not simply a processing at the scene of the arrest. In *Gustafson v. Florida*, 414 U.S. 260, 265–66, 94 S.Ct. 488, 491–92, 38 L.Ed.2d 456 (1973), the Supreme Court observed:

> It is sufficient that the officer had probable cause to arrest the petitioner *and that he lawfully effectuated the arrest and placed the petitioner in custody.* In addition, as our

decision in *Robinson* makes clear, the arguable absence of "evidentiary" purpose for a search incident to a lawful arrest is not controlling. *Id.* "The authority to *search* the person *incident to a lawful custodial arrest,* while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect."

(Citation and footnote omitted; emphasis supplied).

*United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), was even more emphatic that the very rationale for a search incident to lawful arrest is predicated not simply on the fact of arrest but on the further fact of a full-blown custodial arrest:

The justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect *in order to take him into custody* as it does on the need to preserve evidence on his person for later use at trial.

414 U.S. at 234, 94 S.Ct. at 476 (Emphasis supplied).

It is scarcely open to doubt that the danger to an officer is far greater in the case of the extended exposure which follows *the taking of a suspect into custody* and transporting him to the police station than in the case of the relatively fleeting contact resulting from the typical *Terry*-type stop. This is an adequate basis for treating *all custodial arrests* alike for purposes of search justification.

414 U.S. at 234–35, 94 S.Ct. at 476 (Emphasis supplied).

The authority to *search* the person *incident to a lawful custodial arrest,* while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. *A custodial arrest* of a suspect

based on probable cause is a reasonable intrusion under the Fourth Amendment....

414 U.S. at 235, 94 S.Ct. at 477 (Emphasis supplied).

[W]e hold that *in the case of a lawful custodial arrest a full search of the person* is not only an exception to the warrant requirement of the Fourth Amendment, but *is* also *a "reasonable" search under that Amendment.*

*Id.* (Emphasis supplied).

[I]t is the fact of custodial arrest which gives rise to the authority to search ...

414 U.S. at 236, 94 S.Ct. at 477 (Footnote omitted; emphasis supplied).

The Maryland case law has, indeed, been even more explicit than has the Supreme Court in delineating precisely what is an arrest for purposes of justifying a Fourth Amendment search incident to lawful arrest. In *Bouldin v. State,* 276 Md. 511, 515–16, 350 A.2d 130 (1976), Chief Judge Murphy was very clear:

It is axiomatic that when the State seeks to justify a warrantless search incident to arrest, it must show that the arrest was lawfully made prior to the search. Of course, *the right to arrest is not equivalent to making an arrest; the record must satisfactorily demonstrate that an arrest was in fact consummated before a warrantless search incident thereto may be found to be lawful.*

It is generally recognized that an arrest is the taking, seizing, or detaining of the person of another (1) *by touching or putting hands on him;* (2) or by *any act that indicates an intention to take him into custody* and that subjects him to the actual control and will of the person making the arrest; or (3) by the consent of the person to be arrested.

(Citations omitted; emphasis supplied).

In *McChan v. State,* 238 Md. 149, 157, 207 A.2d 632 (1965), the Court of Appeals was equally insistent that a formal arrest is an indispensable predicate for a search incident to arrest:

An arrest has been defined as "the detention of a known or suspected offender for the purpose of prosecuting him for a crime." ... [T]here is a detention only when there is a touching by the arrestor or when the arrestee is told that he is under arrest and submits. Where there is no touching, the intention of the arrestor and the understanding of the arrestee are determinative, for in order for there to be an arrest in such case, *there must always be an intent on the part of one to arrest the other* and an intent on the part of such other to submit. When one is approached by a police officer and merely questioned as to his identity and actions, this is only an accosting and not an arrest. *See also* Kauffman, *The Law of Arrest in Maryland,* 5 Md. L.Rev. 125, 131[.]

(Citations omitted; emphasis supplied).

■ In *Cornish v. State,* 215 Md. 64, 67–68, 137 A.2d 170 (1957), Judge Hammond was equally emphatic about the requirements for an arrest under Maryland law:

In *Baltimore & O. R. Co. v. Cain,* 81 Md. 87, 31 A. 801, and *Baltimore & Ohio R. Co. v. Strube,* 111 Md. 119, 127, 73 A. 697, this Court has built a working definition of an arrest—the detention of a known or suspected offender for the purpose of prosecuting him for a crime. It has been said that there is detention only when there is a touching by the arrestor, although some cases have found a detention where there was no touching but the offender, upon being told that he was under arrest, submitted. Certainly, *where there is no touching the intention and understanding of the parties are decisive for, if there is to be. an arrest in such case, there must be an intent on the part of one to arrest the other* and an intent on the part of such other to submit.

(Emphasis supplied). All of the Maryland cases agree that an important factor in deciding whether an arrest actually took place is whether the detaining officers intended to arrest the

detainee.[7]  At the suppression hearing, Officer Wanda Dobbins testified, on cross-examination, that the police did not intend to arrest the appellant and, indeed, did not arrest him:

Q:  How'd you get him to stand before the camera and take—you didn't arrest him, right?  You saw allegedly a, a criminal act take place, but you didn't arrest him, right?

A:  No, we didn't arrest him.

In further examination by the trial judge, Officer Dobbins testified that the grand strategy of this "sweep" was to *make no arrests* at the time of the crimes but to hold back until indictments had been handed down and a large-scale operation could be mounted:

The Court: All right.  And just so the record's clear, why didn't you complete the arrest rather than let him go and arrest him later?

The Witness: Because we—it was an operation we were working on and we had the individuals indicted.

The Court: But I mean, why'd you choose to indict them and arrest him then rather than arrest them one by one as you made the sales?

The Witness: Because we wanted to do it in a mass sweep and keep it confidential until we did it all at one time.

Officer Rowell, who had made the undercover buy from the appellant and who then went to the nearby spot where the

---

7.  We are by no means holding, as the dissent charges us with doing, that the definition of arrest includes "the placing of formal charges" or that "the failure to charge after a detention makes the detention an illegal arrest."  An arrest need not end up in a "booking" procedure or an appearance before a district court commissioner.  What is required, as the *Bouldin, McChan,* and *Cornish* cases clearly tell us, is that there be 1) on the part of the arresting officer an actual subjective intent to arrest the suspect and 2) some communication of that fact to the suspect.  If that were done, there would, indeed, be an actual arrest, even though the police might subsequently change their minds and not follow through with any formal booking for charging procedure.  What we hold was lacking in this case, however, was 1) any intention on the part of the officers to arrest the appellant and 2) any communication of the fact of arrest to the appellant.

appellant had been detained in order to confirm his identification, was equally clear that no arrest occurred:

Q: You agree that this wasn't a search incident to arrest. Isn't that true?

A: Yes.

Q: Because you didn't arrest my client?

A: That's true.

The fact pattern before the Court of Appeals of New York in *People v. Evans,* 43 N.Y.2d 160, 400 N.Y.S.2d 810, 371 N.E.2d 528 (1977), was on all fours with the fact pattern before us in this case. There, as here, a full search of the suspect was made when the police stopped him on the street but the formal arrest did not follow until one month later. The New York Court of Appeals posed the question and provided the answer:

This case involves the elemental question of whether or not the existence of probable cause to arrest justifies a full search where the arrest was not made until one month after the search. Stated differently, the issue before us is whether a warrantless search of the defendant's person may be conducted solely on the basis of such probable cause. We hold that without a contemporaneous arrest such a warrantless search is violative of constitutional rights.

400 N.Y.S.2d at 811, 371 N.E.2d at 529.

There, as here, an undercover narcotics agent purchased narcotics from a suspect. There, as here, the officer radioed a description of the suspect to other police who were waiting nearby. There, as here, the suspect was stopped and detained by the other officers. There, as here, the suspect was required to identify himself and was subsequently searched. There, as here, the money that had been received in the course of the undercover buy was recovered from the pants pocket of the suspect. There, as here, the intrusiveness of the detention went beyond that permitted by *Terry v. Ohio.* There, as here, the suspect was then permitted to continue on his way. There, as here, the suspect was arrested one month after the street encounter. There, as here, the motion to

suppress the physical evidence was denied and the defendant was convicted of distributing narcotics.

The New York Court of Appeals believed, as do we in the present case, 1) that adequate probable cause existed to justify a warrantless arrest of the suspect and 2) that *had* such an arrest been made, a full-blown search incident to arrest could reasonably have followed:

> It is true that Sergeant Guadagno could have arrested the defendant Evans and, in the course of subjecting him to the physical dominion of the State, he could have searched him incidental to the arrest. . . . But *the simple fact that he did not arrest the defendant prevents the justifications from coming into being.*

400 N.Y.S.2d at 812–13, 371 N.E.2d at 530–31 (Citations omitted; emphasis supplied).

We completely agree with the statement of the controlling Fourth Amendment law made by the New York Court of Appeals:

> To adopt the proposition that the search was valid because there was probable cause to arrest puts the cart before the horse. *An arrest is an essential requisite to a search incident,* otherwise once probable cause existed a potential arrestee would be fair game for any intrusions the police deem appropriate for however long they allow him to remain at large. While it has been consistently held that there is no constitutional right to be arrested, the police may not utilize the existence of probable cause as a trump card to justify warrantless personal searches. *Unless and until a person is arrested, a full body search* without a warrant or exceptional circumstances *is constitutionally unreasonable.*

400 N.Y.S.2d at 813, 371 N.E.2d at 531 (Citations omitted; emphasis supplied).

In *People v. Evans,* as in the present case, the police strategy of deferring immediate arrests in favor of a mass sweep was reasonable. Even reasonable strategies, however, sometimes exact a price. In order to avoid the negative

consequence of burning their cover, the police chose not to make immediate arrests. In making that strategic choice, however, they forfeited the advantages that would have been the consequence of having made immediate arrests. The New York Court of Appeals observed that every choice has its up side and its down side:

> The People contend that the instant search is justifiable by virtue of the overriding interest the State has in preserving the undercover status of the buyer. Although we believe that it may be a legitimate police practice to postpone arrests in narcotics cases so that the undercover officer may pursue his work, it is a dangerous *non sequitur* to conclude that constitutional rights should be diminished as a result. The State cannot have it both ways, they must choose. Here *the police made a deliberate choice that the cover was more important than the immediate arrest of the defendant and they must be bound by that choice.*

400 N.Y.S.2d at 813, 371 N.E.2d at 531 (Emphasis supplied).

■ An inextricable core requirement of search-incident law is that the search and the arrest to which it is an incident must be essentially contemporaneous. *People v. Evans* well expressed that indispensable unity of time:

> [A]n essential requisite to a search incident to arrest is that the arrest be lawful and the search be contemporaneous with the arrest.... [O]ur holding today requires that the validity of a search incident to arrest depends ... on unity of time.

> It may be said that the search and arrest must constitute a single *res gestae.* The fact that the search precedes the formal arrest is irrelevant as long as the search and arrest are nearly simultaneous so as to constitute one event.... *Where the arrest and search occur contemporaneously search incident to arrest reasoning will prevail.* In contrast, *where the arrest and search are distinct occurrences,* as here, *the search will be declared invalid.*

400 N.Y.S.2d at 813, 371 N.E.2d at 531–32 (Citations omitted; emphasis supplied).

This Court, in *Anderson v. State,* 78 Md.App. 471, 481, 553 A.2d 1296 (1989), dealt with precisely the same contemporaneity requirement between the search and the arrest to which it is incident:

> It is enough, therefore, that the search closely anticipate, contemporaneously parallel, or follow shortly after the arrest of which it is an incident.[1] *In all three time frames, it is still an incident of the arrest.* This is the purpose of the practical requirement that a lawful arrest and its search incident need only be essentially contemporaneous.
>
> 1 *For a search to be incident to a lawful arrest, there must ultimately be,* whatever the precise sequence between arrest and search incident, *an actual arrest.* The only exemption from the requirement that the probable cause for arrest be consummated by an actual arrest is the case where extraordinary steps have to be taken to prevent the destruction of "highly evanescent evidence." *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973).

(Emphasis supplied).

### *The Structural Integrity of Evidence: "Highly Evanescent" or "Made of Sterner Stuff"?*

Sensitive that its primary argument might be the exposed salient of a search incident to a non-arrest, the State has also entrenched itself behind a fall-back position that does not depend on the fact of an arrest. The State invokes *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) and *Franklin v. State,* 18 Md.App. 651, 308 A.2d 752 (1973).

In *Cupp v. Murphy,* the police had probable cause to believe that Dan Murphy had strangled his wife. As they interrogated him at the station house, however, they had not arrested him. They had no Fourth Amendment charter, therefore, for a full-blown search incident to lawful arrest under *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). When they noticed discoloration under his fingernails, however, they suspected that there might be traces of his wife's blood from the throat scratches she sustained during the strangulation. They asked Murphy's consent to scrape his fingernails. He refused, placed his hands in his pockets, and

immediately started rattling his fingertips against coins and keys. The police grabbed him; restrained him; and, over his protests, scraped the nails. They recovered 1) blood traces of his wife's blood type, 2) bits of skin compatible with that from his wife's throat, and 3) bits of fabric compatible with the nightgown being worn by his wife at the time of her strangulation.

Although there was involved both a seizure and a search of the person that went beyond the permitted scope of *Terry v. Ohio* and although there was the probable cause that could have justified a warrantless arrest, the failure of the police actually to make an arrest precluded any resort to search-incident law. So long as probable cause to make an arrest was present, however, the Supreme Court found to be reasonable the "very limited search necessary to preserve the highly evanescent evidence." 412 U.S. at 296, 93 S.Ct. at 2004. It concluded that "considering the existence of probable cause ... and the ready destructibility of the evidence," the police were reasonable in conducting "the very limited intrusion undertaken incident to the station house detention." *Id.*

Three months after *Cupp v. Murphy* was decided, this Court had occasion to apply it in *Franklin v. State*, 18 Md.App. 651, 308 A.2d 752 (1973). We described, 18 Md.App. at 667–68, 308 A.2d 752, the doctrinal characteristics of *Cupp v. Murphy:*

The Supreme Court next established a complete new species of detention—detention supported by probable cause for arrest notwithstanding the failure to consummate the arrest. This detention was a very different animal from the detention contemplated by *Terry v. Ohio* and *Sibron v. New York.* In the "stop and frisk" situations, detention need only be predicated upon "a reasonable suspicion" or "a reason to believe" and not upon probable cause. Detention, on that less substantial predicate, may never, however, give rise to a search for even highly evanescent or readily destructible evidence. It may serve as a basis only for a "frisk" for weapons. The creation of the new species of detention was necessary to distinguish the *Cupp v. Murphy*

situation from that condemned in *Davis v. Mississippi*[, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676] (1969).

In *Davis,* the Supreme Court refused to countenance the "investigatory detention" as a basis for gathering evidence—in that case, fingerprints—from mere suspects. In *Cupp v. Murphy,* the Court was very careful to use the additional element of probable cause to distinguish this detention from that detention:

> "The respondent in this case, like Davis, was briefly detained at the station house. Yet here, there was, as three courts have found, probable cause to believe that the respondent had committed the murder. The vice of the detention in *Davis* is therefore absent in the case before us."

.     .     .     .     .

*Cupp v. Murphy* was very careful to point out, however, that even a "probable cause detention" will not give rise to a full "search incident" of the person detained.

(Citations omitted).

In *Franklin,* we approved, by analogy to *Cupp v. Murphy,* the warrantless seizure of a suspected rapist's undershorts several hours after the rape. The possible presence of seminal stains, blood stains, and pubic hairs presented a classic case of highly evanescent evidence:

> In the case at bar, we see a striking analogy to the fingernail scrapings of *Cupp v. Murphy.* The possible seminal stains, bloodstains or head, body or pubic hairs that might be discovered by an immediate examination of the undershorts would certainly be, we hold, evidence of a "highly evanescent" nature. Even if the appellant did not consent to the seizure of the shorts and even if the appellant was not under arrest, we believe the search and seizure was constitutionally valid, as a now-recognized exception to the warrant requirement, by virtue of being a "search incident to a probable cause detention for highly evanescent evidence."

■ The thrust of the State's argument on evanescence is that the evidence in this case, if not seized immediately, might easily have been hidden or otherwise irretrievably lost. The argument refers especially to the ten dollar bill with its recorded serial number that might quickly have been spent and merged, thereby, untraceably into the general currency flow. Under so all-embracing a definition of evanescence, however, it is difficult to conceive of anything, save perhaps the Washington Monument or the Great Pyramid, that would not be evanescent. A stolen car (or truck) may, after all, be quickly driven out of state, readily disguised under a fresh coat of paint, or emerge from a "chop shop" in a dozen disconnected fragments. A stolen car (or truck), nonetheless, is not highly evanescent. Nor is documentary evidence (though paper may burn) nor cash (though money may be spent) nor narcotics in containers and packages (though drugs may be consumed).

Evidence that is vulnerable to being hidden or destroyed by human agents is not the same thing as evidence that will, by its very nature, evanesce without any conscious human intervention. A Luger of the sturdiest manufacture may lie "full fathom five" beneath the center span of the Bay Bridge, but it will not have evanesced. Even from its watery grave, its structural integrity will shine on, uncompromised.

*Webster's Third New International Dictionary* 786 (1966) defines the verb "evanesce" as "to dissipate or disappear like vapor." The Blood Alcohol Content in the human body is highly evanescent. By an inexorable metabolic process, it progressively dissipates with every passing minute and the stoutest will can neither stop nor slow down the process. *Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–38, 16 L.Ed.2d 908, 919–20 (1966); *Welsh v. Wisconsin,* 466 U.S. 740, 753–54, 104 S.Ct. 2091, 2099–2100, 80 L.Ed.2d 732, 745–46 (1984). Dirt beneath the fingernails is evanescent. *Cupp v. Murphy,* 412 U.S. 291, 296, 93 S.Ct. 2000, 2004, 36 L.Ed.2d 900, 906 (1973). There is no way it can be preserved short of mummifying its carrier. Pubic hairs or semen stains on a probable rapist's underwear are evanescent. *Franklin v.*

*State,* 18 Md.App. 651, 308 A.2d 752 (1973). Evanescent evidence is such stuff as has the *inherent tendency* to evanesce—to dissipate—to dissolve—to disappear—to vaporize—to resolve itself into a dew.

The ten dollar bill and the nine vials of crack cocaine in this case were simply not of that ephemeral quality. It is, rather, the State's alternative argument that has, almost in the course of its being articulated, evanesced.

*JUDGMENTS REVERSED; COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.*

SONNER, Judge, dissenting.

I respectfully dissent. I would affirm the conviction for reasons that I have listed below. I believe the majority has reached a wrong decision because it has defined arrest incorrectly and, consequently, has wrongly determined that the police search in this case was violative of the constitutional rules established for permissible searches incident to arrest. The court's opinion defines arrest to be not only the taking, seizing and the detention of another, but also the placing of formal charges. The majority then finds that the failure to charge after a detention makes the detention an illegal arrest. The incorrect definition will have the consequence of forcing the police, after each custodial search without a warrant, to institute prosecution, or else endure the probable suppression of evidence they have gathered incident to the custodial detention.

This case arises from the conviction of a street-level drug dealer who was identified by an undercover police strategy named "Operation Mid–East," which targeted the area surrounding Monument and Port Streets in Baltimore City. On June 9, 1994, Officer Kenneth Rowell of the Baltimore City Police was working undercover during the early evening hours by walking through the area and asking people whom he suspected of being street dealers if "they were working." The first person he asked refused his solicitation. When Rowell approached appellant Dwight Evans, he answered in the affir-

mative, so Rowell informed him that he wanted "dimes," the current street term for $10.00 worth of cocaine. He then purchased cocaine from appellant with a marked $10.00 bill. Officer Rowell was wearing a secreted body mike when he made the purchase, which allowed other officers who were working in concert with him to overhear the transaction. After he made the purchase, he walked sufficiently far away from appellant so that he could not be heard talking to the other officers over his body mike, and gave them a description of Evans. He next returned to his car and broadcast a second description over his police radio and waited until he received confirmation that the other officers had detained someone. He then drove by the location of the other officers and broadcast back to them that they had stopped the same person who had sold him the cocaine.

Officer Timothy Chester, who was then detaining appellant, searched him and recovered $163.00 in cash, including the marked bill that Rowell had used to make his purchases. Chester failed to discover any drugs, so he contacted Rowell and learned that Evans had taken the vial he had sold him from his "rear area." Officer Chester, then apparently in an "alleyway", while two female officers turned their backs, put on a rubber glove and extracted nine vials, "one by one", from appellant's rectum.[1] The contents of the vials were later analyzed and found to be cocaine.

The police then photographed appellant. When his father, who had been called by the police, came to where they were holding him and verified appellant's identification, they released him. They did not choose to file charges against him at that time because an aspect of their strategy for the enforcement effort in that neighborhood was to make arrests as part of a "mass sweep" at a later time. This would avoid exposing

---

1. Officer Valencia Norris Vaughn, one of the two female officers, testified that she "believed" that the search occurred in an alleyway. Appellant's cousin testified for the defense and said she was with appellant when the police arrived and that they "put his hands on the hood of the police car and they searched him . . . then they searched his rectal area."

the undercover officers' activity and improve their ability to continue to make purchases of illegal narcotics there. As a major part of the strategy, the police intended to accumulate 60 to 80 controlled undercover purchases over a one to three month period and then, working with the State's Attorney's Office, charge the identified dealers who then were to be arrested on a "hit day."

Appellant eventually was charged in the Circuit Court for Baltimore City. At a suppression hearing, and again at the trial, he alleged that the search violated his constitutional rights because it was not incident to a lawful arrest. In this appeal, he has devoted the major part of both his brief and the oral argument to allege that the search of his rectum was an offensive and unwarranted intrusion that compels the suppression of the nine vials of cocaine that the police seized during the detention. The police officer made the search during daylight hours, in a public alleyway or street, in the presence of two female police officers who, the trial testimony showed, "turned their backs" during the time that the male police officer donned a rubber glove and extracted nine small vials from the appellant's rectum "one by one."

It is hard to imagine a more intrusive search or one that would encroach more offensively into an area in which the public has a greater expectation of privacy and protection from governmental probing. As one court has phrased it:

> Physical examinations of sexual organs and/or body cavities by non-medical personnel, however, are not routine to our everyday lives. In addition to being medically unsound, the forceful probing and examining of the vagina and anus by strangers attacks the very dignity, privacy and integrity upon which our Constitution is founded.

*United States ex rel. Guy v. McCauley,* 385 F.Supp. 193 (E.D.Wis.1974).

It is disquieting, to say the least, to contemplate supervising police officials requiring subordinate personnel to enforce the controlled dangerous substance laws by carrying rubber gloves as standard equipment and to conduct examination of

body cavities in order to gather evidence. To say more, it seems most intolerable to permit the unbridled discretion of officers on the street to decide when and under what circumstances they can don rubber gloves and require arrestees to disrobe sufficiently to permit them to penetrate and probe body cavities for evidence.

Neither the Court of Appeals nor this Court has considered the constitutionality of the police practice of searching body cavities of those whom they have probable cause to believe are in possession of contraband narcotics. Forty-five years ago, the Supreme Court expressed outrage about, and was offended by, police officials who took a defendant under arrest to a hospital and employed a physician to force him to regurgitate capsules of morphine. The Court said:

[T]his course of proceedings by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation.

*Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952). It would seem that body cavity searches should be subject to the same constitutional limitations that the Supreme Court has set out in *Rochin* for the search of stomach content.

In the case of *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Supreme Court permitted the extracting of a blood sample from an arrestee, but in doing so, the Court clearly mandated that the relatively unintrusive and simple process of puncturing the skin to take a blood sample must be performed by trained medical personnel in a hospital setting. For certain, had the search in *Schmerber* been performed by a police officer on the street under conditions similar to those under which appellant submitted to a rectal search, the resulting decision would have been different. Justice Brennan, speaking for the Court, noted that, "[Schmerber's] blood was taken by a physician in a hospital ... according to accepted medical practices." Justice Brennan also noted that

[the court was] not presented with the *serious question which would arise if a search .involving use of a medical technique, even of the most rudimentary sort,* were made by other than medical personnel or in other than a medical environment—for example, *if it were administered by police* in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain.

*Id.* at 771–72, 86 S.Ct. at 1836. (Emphasis added.) Justice Brennan went further:

The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the state's minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusion, or intrusions under other conditions.

*Id.* at 772, 86 S.Ct. at 1836.

Neither *Rochin* nor *Schmerber* stands for the proposition that every special search of every defendant under arrest needs to be performed in a hospital or medical setting, or that the police need to obtain approval of every personal search from a neutral and detached official. Indeed, the Supreme Court in *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), held that "a full search of the person" incident to a custodial arrest "is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." But one cannot read *Robinson* to hold that every search of the person incident to arrest is *per se* reasonable. Searches that are incident to valid arrests may offend the Fourth Amendment if they violate "the dictates of reason because of ... their manner of perpetration." *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974).

It would seem that a proper interpretation of our Fourth Amendment protections can draw a definite and clear line that does not require the police to seek court approval in gathering evidence when they do so as part of routine arrest procedures,

such as the taking of fingerprints or the photographing of those under arrest, but would restrict police discretion for those searches that, because of their offensive or intimate nature, trespass into the sphere where citizens reasonably expect privacy. But wherever the line is drawn, it would not likely permit the kind of search that appellant was subjected to in this case. The intrusion was not minor, and the conditions were not stringently limited. It coarsens our lives and diminishes the collective privacy of all citizens for the government, in the enforcement of its drug laws, to permit the police, when they have reason to believe that evidence is secreted in a body cavity, to then decide in a public place to enter that body cavity and probe around for drugs.

The majority opinion correctly points out that the only evidence of the offensive nature came out during the trial on the merits and not during the motion to suppress. And when that evidence did come out, appellant did not move, as he could have, to reopen the suppression hearing and reconsider the denial of the motion. The State argues, and the majority agrees, that this means that appellant failed to preserve the issue. If appellant, either by way of argument or evidence, did not permit the court below to consider whether the evidence resulting from the search should have been suppressed on the ground that it was unreasonably intrusive, then it cannot raise the issue for the first time on appeal. *Trusty v. State,* 308 Md. 658, 521 A.2d 749 (1987); *Riddick v. State,* 319 Md. 180, 571 A.2d 1239 (1990).

I must reluctantly agree. The facts that we should have to evaluate the reasonableness of the search do not appear to be in dispute. Nevertheless, the State should always be afforded the opportunity to offer evidence in the circuit court of the necessity and the reasonableness of the search and to argue to that court why the law permitted the police practice. Except in rare instances, we should not reverse a decision on a ground that the trial judge was not afforded the opportunity to rule upon.

Based on the record we have before us, and after hearing the arguments on appeal, had the issue been properly preserved, I would reverse and remand. At a new trial, the State could still introduce the strong evidence that was not acquired as a result of the rectal search, which would include the seized marked $10.00 bill, the testimony of Officer Rowell, the purchased vial of cocaine, as well as the testimony of those officers who overheard his transaction broadcast over the body mike.

The majority, however, finds that the entire search is unreasonable and violative of the constitutional rights of appellant on other grounds, namely, that the search was not incident to an arrest and that, therefore, it does not qualify as an exception to the warrant requirement. It is upon that issue I must disagree.

I believe that the majority has gone astray by expanding the application of the Fourth Amendment's exclusionary rule in a manner that does not provide protections from unwarranted government interference in citizens' daily lives. It paradoxically reduces police discretion in a manner that will subject some defendants to more harsh treatment in the criminal justice process and, at the same time, condemn police searches in cases in which the police have done no wrong.

The majority decision disapproves of the taking of the appellant into custody and then not subjecting him immediately to what, in some jurisdictions, is referred to as "booking," the process by which arrested persons are formally charged. Under Maryland procedure, it would mean that the arresting officers in this case would have had to go before a district court commissioner to begin the charging process. Rule 4–212(f) of the Maryland Rules provides, "When a defendant is *arrested without a warrant*, the defendant shall be taken before a judicial officer of the district court without unnecessary delay and in no event later than 24 hours *after arrest.*" Rule 4–213(a) then provides for what is to occur at the appearance and is titled "In District Court *Following Arrest.*" The section reads, "When a defendant appears before a judi-

cial officer of the district court *pursuant to an arrest,* the judicial officer shall proceed as follows...." (Emphasis supplied.) The rule goes on to explain the procedure for advising the defendant of the charges and rights, as well as the processing of the initial paper work and determination of bond or pretrial release. What is obvious from the rules is that our Maryland procedure envisions arrest as independent and distinct from charging. To define "arrest" as the majority does, so as to include the placing of charges, confounds the term by confusing it with "prosecution."

The Fourth Amendment does not seek to regulate searches incident to prosecution, but those that are incident to arrest. No one can seriously contend that appellant was not "arrested" by the police when he was stopped and detained and then subjected to two searches—one in which the police recovered money, and then the later search in which they recovered the nine vials of cocaine. The constitutional protections should apply, and in my opinion do apply, to the police activity in detaining in custody those whom they wish or need to search with or without a warrant. Our appellate analysis and decision here should be confined to a determination of whether, at the time of the police restriction of Evans's liberty, the police had the necessary probable cause to permit them to arrest and to make a reasonable search, or whether the search was justified by some other exception to the warrant requirement.

I believe that there can be no sound argument that the police participating in Operation Mid–East did not have probable cause to arrest appellant. Indeed, the appellant's brief and oral argument conceded that the police were detaining appellant with probable cause. The majority, however, here contends that the police lost their power to search when, after taking appellant into custody, they thereafter failed to take the additional step of placing formal charges against him. The majority takes the position that, to constitute an "arrest," the police are required to go further than just taking someone into custody. The majority concludes that since any seizure resulting from the police activity—whatever it is to be called— does not result from a valid arrest, the seized goods must be

considered to have been taken from the defendant in violation of the Fourth Amendment.

In support of such an interpretation, the majority opinion cites two United States Supreme Court cases, *Gustafson v. Florida,* 414 U.S. 260, 265–66, 94 S.Ct. 488, 491–92, 38 L.Ed.2d 456 (1973) and *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). I read those cases differently. Both consider whether the defendant was in custody and whether the police had, in fact, made an arrest. They clearly do not define arrest as including a police charging procedure. Instead, they simply hold that the police activity in those cases constituted arrests, nothing more. The same can be said for *Bouldin v. State,* 276 Md. 511, 350 A.2d 130 (1976), cited by the majority, in which Chief Judge Murphy, writing for the Court, defined arrest as follows:

the taking, seizing, or detaining of the person of another (1) by touching or putting hands on him; (2) or by any act that indicates an intent to take them into custody and that subjects him to the actual control and will of the person making the arrest; or (3) by the consent of the person arrested.

*Id.* at 515–16, 350 A.2d 130. That seems to me to be just what we have here. Nowhere in *Bouldin* does the Court indicate that an arrest requires that the police, who have taken the person in custody, continue on to the charging procedure or suffer the consequence that what they have done will not be defined as an arrest for application of the laws controlling search and seizure.

The majority also cites *Cornish v. State,* 215 Md. 64, 137 A.2d 170 (1957), in which Judge Hammond, in defining arrest, noted that the detention must be accompanied by an intent to prosecute the person detained for crime. That does not appear to bolster the definition of arrest that the majority proposes here. The short answer to *Cornish* is that all of the evidence clearly indicated that the police intended to prosecute all of those arrested as a result of Operation Mid–East; indeed, there would be no case before the Court today if that

had not been their intention with regard to appellant. *Cornish* clearly does not hold that the police may not free the defendant and formally charge him later.

The majority cites another Maryland case, *McChan v. State*, 238 Md. 149, 207 A.2d 632 (1965), for the principle that the arrests that result in seizures must be "formal." I read the case as requiring that there be an intent to arrest and, again, that the purpose of the arrest be for criminal prosecution. Nowhere in *McChan* is there the mention of formal charging as an element of arrest, or a statement that detention without an immediate charge runs afoul of the Fourth Amendment protections.

In the case of *People v. Evans*, 43 N.Y.2d 160, 400 N.Y.S.2d 810, 371 N.E.2d 528 (1977), the Court of Appeals of New York labeled a search illegal when it resulted from an arrest by the police that did not lead to formal charging. The case is remarkably similar to the case we have decided today or, as the majority has put, it is "on all fours." The defendant even has the same last name. But being on all fours does not necessarily mean that it is well reasoned or reflect intelligent public policy.

Requiring the police to charge every person they detain and search forwards no valid public interest, much less any of the values that the Fourth Amendment's exclusionary rule is meant to protect. The violations of privacy or detention and search will have already occurred. Intrusions had occurred in both the Maryland and New York *Evans* cases. The Fourth Amendment protection against illegal searches and seizures and the privacy interest that the exclusionary rule is believed by some to protect will not, in any way, be serviced by attaching a further requirement that the police lodge a formal charge after they have searched.

One of the justifications for the exclusionary rule is the belief that "blundering constables" [2] will be deterred from

---

2. Justice Benjamin Cardozo said, while on the Court of Appeals of New York, in a decision that refused to apply the exclusionary rule to illegal

illegal arrests if they are deprived of the opportunity to offer evidence from illegal arrests. How will the police be deterred by the rule we fashion here today? We are saying to the police that legal detentions, not accompanied by a formal charge, will result in the suppression of evidence. We incorrectly hold that the valid arrests based on sufficient probable cause will also have to subject defendants to the bail process, require them to obtain counsel, and possibly to experience all the other impositions on accused persons that are well known to accompany the criminal process.[3] This additional requirement for the police can hardly be one that will be welcomed by those who have occasion to be stopped by the police or, indeed, be welcomed by citizens in general, many of whom value being subjected to as little government interference as possible.

Nor does the requirement improve justice by restricting police discretion and the authority that they ordinarily exercise to choose not to charge immediately, or possibly not to charge at all. There are numerous and varied reasons why the police may choose to set arrested defendants free rather than "book" them. One, of course, is the strategy here that the police employed in the operation designed to rid the neighborhood around Monument and Port Streets of the scourge of street drug dealing. Certainly, even if one is opposed to the mass arrest approach and the public attention

---

searches in state prosecutions, "There has been no blinking the consequences. The criminal is to go free because the constable has blundered." *People v. Defore,* 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926).

**3.** In *Klopfer v. State,* 386 U.S. 213, 222, 87 S.Ct. 988, 993, 18 L.Ed.2d 1 (1967), the Supreme Court explained just how charging itself, even without a conviction, can deprive those accused of fundamental rights. Pending charges may subject a defendant to "public scorn and deprive him of employment, and almost certainly will deprive him of his speech, associations, and participation in unpopular causes," and will also subject a defendant to the "anxiety and concern accompanying public accusation." *United States v. Ewell,* 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966). In *Gerstein v. Pugh,* 420 U.S. 103, 115, 95 S.Ct. 854, 864, 43 L.Ed.2d 54 (1975), the Court pointed out that arrest resulting in formal charges may lead to pretrial confinement interrupting one's source of income and that even "pretrial release may be accompanied by burdensome conditions that affect liberty."

that will accompany a "hit day," any opposition to such a strategy does not rise to the level of a constitutional or Fourth Amendment violation, at least on any of the facts presented through this appeal.

A second reason for not immediately charging could be to entice a possible informant to lead to higher up participants in the drug distribution network, a long-standing and common police practice. And a third might simply be mercy or, perhaps stated more accurately, the common sense appreciation of the recognized limits of the courts and the criminal justice process to solve the social problems that lead to police involvement. Experience has shown that often the extreme remedy of formal prosecution may exacerbate rather than relieve problems. The criminal justice system, in the last two or three decades, has generated a number of programs for the police and prosecutors to divert defendants from the formal and adversarial process and into community service and treatment. The rule we announce today augers against that well-accepted practice.

A fourth reason not to charge might be for the law enforcement officer who is not completely sure whether the person whom he has taken into custody has violated a law. Or the police officer may not be sure just exactly what the charge should be and may wish to consult with superiors or with the State's Attorney's Office. It would be far better to establish a rule that encourages consultation rather than establish one that punishes conscientious police for their desire to do what is proper, as well as lawful.

I believe that the police deferring the formal charging in this case was proper, as well as lawful and, therefore, I believe that the decision of the court below should have been upheld.