647 A.2d 1229

**Kirk Douglas AIKEN**

**v.**

**STATE of Maryland.**

**No. 1818, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Sept. 28, 1994.

558

Michael R. Malloy, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., on the brief), Baltimore, for appellee.

Submitted before MOYLAN, FISCHER and DAVIS, JJ.

FISCHER, Judge.

Appellant, Kirk Douglas Aiken, was charged with first-degree rape, two counts of armed robbery, two counts of use of a handgun in commission of a felony, and related charges. A jury, sitting in the Circuit Court for Prince George's County (Missouri, J., presiding), found him guilty of all charges. On November 18, 1993, appellant received sentences totaling life plus thirty-five years for the convictions of first-degree rape, two counts of armed robbery, and two counts of use of a handgun in commission of a felony. The remaining convictions were merged for purposes of sentencing.

## QUESTIONS PRESENTED

On appeal, appellant asks the following questions, which we have slightly rephrased:

 I. Did the lower court err in denying appellant's motion to suppress the evidence derived from appellant's stop and arrest?

 II. Did the lower court err in denying appellant's motion to suppress the evidence seized from his bedroom during a warrant search?

III. Did the lower court err in denying appellant's motion to suppress the photographic identification of appellant by a victim?

IV. Did the lower court abuse its discretion in denying appellant's motion to exclude the handgun found near the scene of appellant's arrest?

V. Did the lower court abuse its discretion in allowing a medical expert to testify regarding a medical report that was discovered during trial?

## FACTS

On October 7, 1990, at approximately 2:00 a.m., victim # 1 was returning to her home in Greenbelt. As she closed her car door and turned to walk to her town house, she was confronted by appellant. Appellant pointed a handgun at her and threatened to shoot her. Appellant told her to lie on the ground. She lay down on her stomach between two parked cars. Appellant then demanded that she give him all her jewelry and her automatic teller machine card, and she complied with his demands. Among the jewelry taken were a pinkie ring with the initial "B" on it, a blue topaz ring with four diamonds, a University of Maryland class ring with the initials of victim # 1 on it, and two diamond stud earrings.

Appellant then searched the pants of victim # 1 for money. He fondled her breasts and pulled down the jump suit and panties she was wearing. Appellant then had forced vaginal intercourse with her. During the entire time, appellant kept the gun pointed at her and also threatened to kill her.

A car, pulling into the parking lot, distracted appellant. He left victim # 1 and confronted victim # 2, who had just parked her car and was walking to her town house. Appellant pointed the handgun at victim # 2, demanded her purse, and threatened to shoot her if she did not comply. Victim # 2 was not carrying a purse, but handed appellant the money she had in her pockets. Appellant then demanded victim # 2's jewelry. Victim # 2 was incensed by this demand and she screamed. Appellant fled.

In the early morning hours of November 18, 1990, the Montgomery County Police stopped appellant and arrested him on a charge unrelated to this case. In conjunction with the Metropolitan Police Department, Montgomery County Police officers searched appellant's home in Washington, D.C. Victim # 1's pinkie ring, blue topaz ring, University of Maryland class ring, and diamond stud earrings were recovered from the top dresser drawer in appellant's bedroom.

The police conducted two photo arrays with each of the victims. Victim # 1 was not able to identify her assailant. When victim # 2 viewed the second array, she positively identified appellant as the robber.

We shall include additional facts as necessary in our discussion of the issues presented.

## STANDARD OF REVIEW OF SUPPRESSION HEARINGS

In reviewing the denial of a motion to suppress, we consider only the record of the suppression hearing and not of the trial itself. *Jackson v. State*, 52 Md.App. 327, 332 n. 5, 449 A.2d 438, *cert. denied*, 294 Md. 652 (1982). We extend great deference to the fact finding of the suppression court and accept the facts as found, unless clearly erroneous. *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990); *Perkins v. State*, 83 Md.App. 341, 346–47, 574 A.2d 356 (1990). We then make our own independent constitutional appraisal by reviewing the law and applying it to the facts of this case. *Riddick*, 319 Md. at 183, 571 A.2d 1239; *Perkins*, 83 Md.App. at 346, 574 A.2d 356.

We apply this standard of review to Questions I, IIA, and III.

## DISCUSSION

### I.

Appellant first contends that his stop and arrest, which were conducted by the Montgomery County Police Depart-

ment, were illegal. Appellant claims that they were illegal because the Montgomery County Police had observed no suspicious activity in Maryland. The police believed that they had observed suspicious activity in the District of Columbia after they had followed appellant into the District. The police, however, had not observed a crime in the District. Thus, appellant argues, there was no basis for the Montgomery County Police to stop him once he crossed the border back into Maryland. Without a basis to stop him, appellant alleges, all the evidence seized as a result of the stop and subsequent arrest should have been suppressed.

On November 17, 1990, the Montgomery County Police set up a street surveillance in the area around the Chevy Chase Circle, which borders Montgomery County and the District of Columbia. Sergeant Willard Liston was in charge of the surveillance. The police were looking for a suspect who they believed was involved in nine armed robberies and one homicide that had occurred in that neighborhood. Two of the armed robberies had occurred in Montgomery County. The remaining seven armed robberies and the homicide had occurred in the District.

The suspect was described as a black male in his twenties, approximately six feet tall and 180 pounds with short hair, a high forehead, and a receding hairline. The police believed that he was operating a dark-colored car, possibly a Ford Motor Company sedan. The Metropolitan Police Department of Washington, D.C. had provided the Montgomery County Police with a photograph of the suspect that was taken when the suspect used a victim's automatic teller machine card.

Sergeant Liston was parked at the corner of Chevy Chase Parkway and Connecticut Avenue in the District of Columbia and observed the traffic pattern around the Chevy Chase Circle. During this time, appellant stopped next to Sergeant Liston at the stop sign on that corner. Sergeant Liston believed that appellant matched the description of the suspect. Appellant was driving a dark-colored General Motors sedan. Appellant then made several turns, which took him back into

the neighborhood he had just left. This was not the normal traffic pattern for that area.

A check of the District of Columbia license plates on the sedan revealed that the District had no record of the tag number on file. This indicated to Sergeant Liston that there was some problem with the registration or some traffic-related problem. The police then lost sight of the sedan.

Later that evening, at approximately 11:50 p.m., the sedan, with appellant still driving, was observed briefly in Montgomery County before it turned back into the District of Columbia. The Montgomery County Police followed appellant into the District where they observed him park on 29th Street. Appellant did not get out of the car. Sergeant Liston then drove by appellant and appellant pulled out behind the sergeant, but did not turn on his headlights. Sergeant Liston evaded appellant, turned off his lights, and backed into a driveway. Within several minutes, the sergeant observed appellant driving slowly up the street with his lights out. Appellant was looking around in all directions, as if he was searching for someone.

Appellant later stopped on 31st Street, turned off his lights, sat there for a few minutes, and then pulled away. During the surveillance, Officer Robert Moser observed appellant reduce his speed and drive slowly by people on the sidewalks. Officer Moser testified at the suppression hearing that, when appellant pulled out behind Sergeant Liston and followed him with his lights out, appellant was casing people. Stated another way, Officer Moser believed that appellant was selecting a victim. He testified that this was "a similar pattern of following people, picking a proper victim . . . and leaving the lights off, and hopefully the victim wouldn't be able to detect [him]."

Sergeant Liston believed that appellant's behavior was consistent with how the nine robberies had occurred in that neighborhood, two of which had occurred in Montgomery County. The robbery victims were assaulted as they were arriving at home and getting out of their cars. The sergeant

also believed that appellant matched the description of the man they were seeking.

Eventually, appellant appeared to be completing a loop and was heading back to the area where the police had begun following him. Sergeant Liston instructed the other officers involved in the surveillance to stop appellant when he crossed back into Montgomery County.

When appellant entered Montgomery County, an unmarked police car displayed a flashing red light and sounded its siren in an attempt to stop appellant. Appellant attempted to turn left, but was blocked by another unmarked police car. Appellant then veered to the right, drove the car up a front yard, and jumped from the car. Appellant fled through the residential area. The officers pursued appellant. Officer Moser, who was involved in the chase, observed appellant reach into his waistband. As a result of what he observed, the officer believed appellant was reaching for a weapon. The police broke off the chase after they lost sight of appellant, but began to set up a search perimeter.

The officers then checked the car appellant had been driving. They found that the ignition had been "punched," which led them to conclude that the car was stolen. As the police were beginning their search, appellant was seen running through a back yard.

Officer Moser eventually found appellant hiding inside a garage. When appellant emerged from the garage, Sergeant Liston compared appellant's appearance to the photograph of the suspect the police were seeking. The sergeant was certain that appellant matched the photograph. Appellant was then arrested. The arrest occurred in Montgomery County.

A gun was later found near a fence that appellant had jumped in his attempt to evade the police.

■ In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that police officers may stop persons to investigate possible criminal activity. *Id.* at 21–22, 88 S.Ct. at 1879–81. These investigatory stops are

"justified by some objective manifestation that the person is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). A valid investigatory stop requires only that "the police have specific articulable facts which, taken together with rational inferences from those facts, create reasonable suspicion that the person has been or is about to be involved in criminal conduct." *Aguilar v. State*, 88 Md.App. 276, 281, 594 A.2d 1167 (1991).

In finding the stop valid, the lower court stated:

First issue is whether or not we had the basis to even make the stop, and having decided that, we go to part number two. Seems to me, using the test again of the totality of the circumstances, I think there was a basis just to execute the stop. I'm not sure had he not run what would have happened as a result of that stop, very frankly, but he did run, so it seems to me they had the right then to pursue him, he gave them plenty of ground at that point to go ahead and make the detention.

The Montgomery County Police Department clearly had reasonable suspicion to stop appellant. It is immaterial that the police observed appellant engage in the suspicious activity in the District of Columbia. Appellant attempts to graft a geographic location requirement upon the standard for an investigatory stop enunciated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). No such requirement has been established by the United States Supreme Court or the appellate courts of this State.

Furthermore, the Montgomery County Police Department would have been remiss in their duties if they had not stopped appellant when he drove back into Maryland. The police knew that nine robberies and one homicide had occurred in that neighborhood. Two of the robberies had taken place in Montgomery County. It is clear from the record, however, that the "neighborhood" encompassed both the District and Montgomery County without reference to jurisdictional boundaries. Appellant crossed the border between the two jurisdic-

tions without hesitation while searching for victims within the target "neighborhood." With part of that "neighborhood" in Montgomery County, the police were authorized to stop appellant based on what they had observed in the District of Columbia.

█ When the police validly attempted to stop appellant, he fled. The police then checked appellant's car and found that the transmission had been "punched;" thus, they had probable cause to believe that the car was stolen. Finally, when appellant emerged from the garage in which he was hiding, Sergeant Liston held the photograph of the robbery suspect next to appellant's face. The sergeant believed that appellant was the man in the picture. Consequently, the police had probable cause to arrest appellant.

In summary, because the police had reasonable suspicion sufficient to stop appellant, which later matured into probable cause to arrest appellant, the trial court properly denied appellant's motion to suppress all evidence seized as a result of his stop and arrest.

## II.

Appellant next contends that the lower court erred in failing to suppress the jewelry seized from his bedroom during a warrant search. Appellant divides his contention into two areas. First, he claims that, because the jewelry was not listed in the search warrant, it could not be seized. The argument continues that, because the jewelry could not be seized, it was not admissible. Furthermore, appellant contends, the evidence could not be seized under the plain view doctrine. Second, appellant asserts that the jewelry was inadmissible because it was not listed on the search warrant return. Appellant contends that listing the jewelry on the search warrant return was a mandatory and not a ministerial function; thus, the jewelry should not have been admitted.

We shall address each claim separately, but first we set forth the evidence presented at the hearing on appellant's motion to suppress the evidence seized from his bedroom.

Lieutenant Phillip Michaels of the Metropolitan Police Department in Washington, D.C. applied for a search warrant for appellant's home in Northeast Washington, D.C. The warrant was issued and executed the day after appellant's arrest.

Detective Jack Toomey of the Montgomery County Police Department and Detective Susan Roberts of the Metropolitan Police Department participated in the search of appellant's home. Specifically, these officers searched appellant's bedroom. Detective Toomey searched appellant's dresser and recognized a Casio digital wristwatch in the top drawer as belonging to a robbery victim.[1] The wristwatch was listed on the search warrant.

Detective Susan Roberts was investigating several robberies when she participated in the search of appellant's home. When the detective looked in the top dresser drawer in appellant's bedroom, she saw numerous pieces of ladies jewelry sitting together in a container. Amidst the jewelry, Detective Roberts immediately recognized two rings as having been described to her by two victims of two separate armed robberies that had occurred in the District. The detective then seized all the jewelry in the container because she suspected that it was all stolen property.

The items that Detective Roberts seized were not listed on the warrant return. Lieutenant Michaels testified at the hearing on the motion to suppress the jewelry that this was probably an oversight on his part. He explained, "I had it in the back of my mind. I don't know why I didn't write it down."

### A. Was the jewelry properly seized, even though it was not listed in the search warrant?

In certain circumstances, the police may seize evidence without a warrant, if the evidence is in plain view. *Coolidge v. New Hampshire*, 403 U.S. 443, 465–71, 91 S.Ct. 2022, 2037–41,

---

1. Detective Toomey was involved in the seizure of additional evidence not at issue in this appeal.

29 L.Ed.2d 564 (1971). Three conditions must be met before evidence may be seized under the plain view doctrine:

1. There must be a prior valid intrusion into the constitutionally protected area;

2. There must be a spotting in plain view of the item ultimately seized; and

3. There must be probable cause to believe that the item spotted in plain view is evidence of crime.

*Sanford v. State,* 87 Md.App. 23, 27, 589 A.2d 74, *cert. granted,* 324 Md. 90, 595 A.2d 1077 (1991), *dismissed,* 325 Md. 159, 599 A.2d 1170 (1992).

■ In the present case, the police were in appellant's home, in his bedroom, and searching through his top dresser drawer pursuant to a valid search warrant issued in the District of Columbia. Thus, there was a prior valid intrusion. When the detectives searched through the top dresser drawer, they discovered the container of jewelry, which was spotted in plain view. Finally, Detective Toomey recognized the Casio watch he saw in appellant's top dresser drawer as listed in the warrant. Detective Roberts immediately recognized two rings within the drawer as stolen property. All the jewelry was sitting together in a container. Consequently, the police had probable cause to believe that the jewelry was evidence of crime. The police were permitted to seize the jewelry under the plain view doctrine. The lower court, therefore, correctly denied appellant's motion to suppress the jewelry.

**B.** *Was the jewelry admissible, even though it was not listed in the search warrant return?*

■ In ruling that the omission in the search warrant return did not require suppression of the evidence, the lower court stated in its order dated June 25, 1992:

Upon consideration of the evidence adduced and the argument of counsel, the Court will find as a matter of law that the current District of Columbia law regarding the returns on search warrants does not mandate suppression of items which are not included in a return. It is clear that

the provision in the Code which provides that all the items seized must be included in the return is ministerial and does not warrant suppression.

Appellant contends that this ruling was in error and that the requirement that the jewelry be listed on the search warrant return was mandatory and not ministerial. Appellant claims that this omission requires that the jewelry be suppressed.

We can find no error with the findings of the lower court. Were we to apply Maryland law or the law of the District of Columbia, the end result would be the same: denial of appellant's motion to suppress the jewelry.

Under Maryland Rule 4–601(d), the return of the warrant is a ministerial function and "failure to comply with the return requirement does not render the search warrant defective or the seizure invalid." *Mills v. State,* 12 Md.App. 449, 457–58, 279 A.2d 473, *cert. denied,* 263 Md. 717 (1971), *cert. denied,* 406 U.S. 967, 92 S.Ct. 2411, 32 L.Ed.2d 666 (1972).

Under the law of the District of Columbia, violation of the procedural rule governing searches and seizures does "not lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision of the Rule." *Criales v. United States,* 621 A.2d 374, 378 (D.C.1993) (quoting *United States v. Burke,* 517 F.2d 377, 386–87 (2d Cir.1975)).

Appellant does not refer us to any prejudice that he suffered from the failure of the police to list the jewelry in the warrant return. Nor is there any indication that the failure of Lieutenant Michaels to list the jewelry on the return was in any way intentional or deliberate. Consequently, the trial court properly ruled that failure to list the jewelry on the search warrant return did not require suppression of the jewelry.

### III.

■ Appellant also contends that the lower court erred in denying his motion to suppress the photographic identification by victim # 2, the robbery victim. Appellant claims that the photographic identification was suggestive and inaccurate.

In November, 1990, victim # 2 viewed a photo array at the Greenbelt Police Station. Corporal Carolyn McLean–Breck conducted the array. Appellant's picture was not included in this array. Victim # 2 did not identify anyone in the photographs as the robber. Victim # 2 did, however, tell the corporal what features of the persons depicted in the photographs were similar to those of the robber. On December 21, 1990, victim # 2 returned to the police station to view a second photo array. This time, she identified appellant as the robber. After victim # 2 made the identification, she asked Corporal McLean–Breck if she had selected the right person. The corporal told her that she had.

■ In challenging the admission of an extra-judicial identification, "the defense has the initial burden of showing some unnecessary suggestiveness in the procedures employed by the police." *Brockington v. State,* 85 Md.App. 165, 172, 582 A.2d 568 (1990), *cert. denied,* 322 Md. 613, 589 A.2d 57 (1991).

When victim # 2 viewed the first photo array, she compared the men in the photographs to the robber. She pointed out what facial features they had in common. Victim # 2 was certain, however, that a photograph of the robber was not contained in the first array. There is nothing suggestive or improper with victim # 2's comments during the first array.

At the second array, victim # 2 identified appellant as the robber. She then asked Corporal McLean–Breck if she had selected the right person. The corporal responded in the affirmative. There was nothing impermissibly suggestive about this procedure. Prior to viewing the photographs, Corporal McLean–Breck informed victim # 2 that a photograph of the robber may or may not be contained in the array. Victim # 2 then identified appellant as the man who robbed

her and it was only *after* victim # 2 identified appellant that the corporal commented on the identification. The corporal's comments had absolutely no effect on victim # 2's identification of appellant. The lower court, therefore, properly denied appellant's motion to suppress the photographic identification.

## IV.

 Appellant next contends that the lower court abused its discretion in denying his motion to exclude the gun found near the scene of his arrest. At trial, appellant's counsel argued that the gun should be excluded because it was removed in time and place from the scene of the crime and because the gun was not connected to the incident by the victims. On appeal, appellant contends that the gun was not adequately connected to the rape and robberies and was, therefore, prejudicial evidence of another bad act by appellant.

 Evidence is admissible if it is relevant to the issues in the case and tends to either establish or disprove them. *Dorsey v. State,* 276 Md. 638, 643, 350 A.2d 665 (1976). "A trial court's determination on relevance will not be reversed by an appellate court absent a clear showing that it abused its discretion." *White v. State,* 324 Md. 626, 637, 598 A.2d 187 (1991). In addition, "physical evidence need not be positively connected with the accused or the crime to be admissible; it is admissible where there is a reasonable probability of its connection with the accused or the crime, the lack of positive identification affects only the weight of the evidence." *Brooks v. State,* 24 Md.App. 334, 344, 330 A.2d 670 (1975) (quoting *Doye v. State,* 16 Md.App. 511, 519, 299 A.2d 117, *cert. denied,* 268 Md. 747 (1973)).

The lower court denied appellant's motion to exclude the gun, but limited the evidence that the State could present regarding recovery of the gun. The lower court stated:

My determination is that I will let the State talk about the gun being recovered at the time, but they cannot have any testimony about him doing anything with that gun other

than the fact that they recovered it from the scene at the time.

Officer George Theodore of the Montgomery County Police Department participated in the arrest of appellant on November 18, 1990. Officer Theodore recovered a Charter Arms .38 revolver from the immediate vicinity of appellant's arrest. Prior to appellant's arrest, the officer had seen appellant in that area. He did not see anyone else in that area until after he had recovered the gun.

In the subsequent search of appellant's bedroom, the police recovered a holster for a gun and a box of .38 caliber ammunition. The holster had the name "Charter Arms" stitched on it. The gun recovered near the scene of appellant's arrest fit the holster.

The night victim # 1 was attacked, she described the gun the assailant held as a small handgun, blue in color, and with a round chamber. Following the robbery, victim # 2 described the gun the robber held as a small, black revolver.

At trial, victim # 1 testified that the assailant threatened to shoot her with a gun. She described the gun as a black handgun. When victim # 1 was shown the gun that the police recovered near the scene of appellant's arrest, she could not identify any differences between that gun and the gun her assailant had pointed at her. Victim # 1 could not say, however, that it was the exact same gun.

Victim # 2 testified that appellant held a "short, black gun." She was shown the gun recovered near the scene of appellant's arrest and stated that the guns were similar because they were both short and black.

We hold that the gun was sufficiently connected to the crimes such that the lower court did not abuse its discretion in denying appellant's motion to suppress the gun. In addition, the lower court's ruling, limiting the testimony regarding the circumstances surrounding the discovery of the gun, protected appellant from any prejudicial evidence of another bad act.

## V.

 Appellant finally contends that the lower court erred in allowing a medical expert to testify regarding a medical report that was discovered during trial. Appellant claims that the medical report should have been excluded. Appellant further argues that the trial court erred in failing to grant his request for a mistrial, so that he could have the report examined by his own expert.

During the second day of trial, the State discovered a medical report that indicated the presence of sperm in the vaginal area of the rape victim. The prosecutor stated that she had just received a copy of the report from Dr. Alan Jodrie, who had examined the rape victim at the Prince George's Hospital Center after the attack. At appellant's previous trial, Dr. Jodrie testified that sperm were not present.[2] The prosecutor stated that she did not know, prior to that afternoon, that sperm were present and that if she had known about the report, she would have disclosed it. Appellant's trial counsel conceded that there had not been an intentional withholding by the prosecutor.

Appellant's trial counsel argued that he had prepared the case based on there being no signs of fluid in the victim's vagina. Counsel stated, "[Dr. Jodrie's] finding the last time was that all the evidence is consistent with no penetration. Obviously my case is based on that." In contrast, the lower court's concern was that, without the ability to cross-examine the victim on this question, appellant would not receive a fair trial. If he were able to cross-examine the victim again, then he would be able to demonstrate that the sperm came from someone other than himself.

The lower court decided to permit testimony on the report, but gave appellant's trial counsel the opportunity to interview Dr. Jodrie prior to his testimony. The trial court also stated

---

**2.** It appears from the record before us that appellant's first case was dismissed for a detainer violation.

that the rape victim would be recalled to testify regarding her last sexual contact before the rape.

The next morning, a Wednesday, appellant's trial counsel moved for a mistrial. Counsel argued that his case was based on there being no proof of penetration and that there were aspects of the medical report that were unusual. Counsel stated that he needed to consult with his own expert.

The lower court denied the motion, but stated a willingness to continue the case until Friday. The lower court then offered to continue the case until Monday. Appellant's trial counsel declined the invitation to continue the case to those dates. Counsel then moved again for a mistrial, which the lower court denied. The trial then resumed.

The rape victim was recalled as a State's witness. She was questioned as to any sexual relations she had within ninety-six hours of the rape. The victim did have intercourse with her boyfriend within twenty-four hours of the rape. Appellant's trial counsel was then permitted extensive cross-examination regarding the circumstances of the intercourse with her boyfriend.

In the course of the victim's cross-examination, the lower court instructed the jury as follows:

Members of the jury, I don't want you to think that [defense counsel] is being insensitive. He is forced in[to] the position of having to ask these questions because of something that he was not aware of previously. They are questions that he must ask.

Dr. Jodrie then testified regarding his examination of the victim and the report that was recently discovered. He stated that he examined the rape victim on the morning of the attack and did not find any sperm or semen. The pathologists report, however, came back positive for the presence of sperm.

On cross-examination, the doctor admitted that he had testified at appellant's previous trial that there were no indications of the presence of sperm. At that time, he did not have the medical report in question. Dr. Jodrie then explained the

term "rare sperm head seen" that was contained in the medical report. "Rare" meant that the number of sperm seen were "quite small." The term "sperm head" meant that the sperm that were seen did not have tails. The doctor stated that this type of finding was equally consistent with older and more recent intercourse.

Dr. Jodrie further testified on cross-examination that a swab had been taken during the exam to test for the presence of acid phosphate. Dr. Jodrie explained that acid phosphate is an enzyme produced by men in their prostate and that is present in seminal secretions. The medical report listed the acid phosphate level of the victim's vulva to be 2.4 units. The doctor further explained that a normal vagina, without the presence of semen, may have up to 20 units. The level between 20 and 100 units is considered an indeterminate range. That is, it is indeterminate for the presence of semen. A level of greater than 100 units "is very consistent with the presence of semen." The doctor interpreted 2.4 units to be a negative acid phosphate test and thought it lent "some argument to the absence of semen."

There is no dispute that the medical report in question should have been disclosed to appellant prior to trial. Rule 4–263(b)(4) & (5). The lower court, however, has discretionary authority as to how it will respond to a discovery violation. Rule 4–263(i). "The question of whether any sanction is to be imposed for a discovery violation, and if so what sanction, is in the first instance committed to the discretion of the trial judge, and . . . the exercise of that discretion includes evaluating whether the violation prejudiced the defendant." *Evans v. State*, 304 Md. 487, 500, 499 A.2d 1261 (1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986).

The trial court correctly recognized the potential prejudice to appellant: the victim had testified when appellant was unaware of the medical report; therefore, appellant did not cross-examine the victim in any manner that attempted to show that the sperm came from someone other than appellant. Recalling the victim and allowing extensive cross-examination

by appellant's trial counsel allowed appellant to demonstrate that the sperm may have come from the victim's boyfriend.

As to appellant's trial counsel's claim that his entire case was based on a theory that there was no penetration, this theory ignores the testimony of the victim in which she states that her attacker did penetrate her vagina.

■ Appellant's final argument, which is based on his alleged need to consult with his own medical expert because there were some aspects of the report that were unusual, is also without merit. First, the lower court offered to continue the case until the following Monday. Appellant's trial counsel declined this offer. Second, appellant's trial counsel was given the opportunity to interview Dr. Jodrie before the doctor testified. Third, the unusual aspects of the medical report were either neutral or helpful to appellant's case. The first unusual aspect of the report was that it contained the statement, "rare sperm head seen." Dr. Jodrie explained this term and stated that this finding was equally consistent with older as well as more recent intercourse; thus, leaving open the argument that the sperm could have come from the victim's boyfriend. The other unusual aspect of the report was that it listed the acid phosphate level of the victim's vulva to be 2.4 units. Dr. Jodrie testified that this finding lent support to appellant's contention that semen was not present; thereby, supporting appellant's position that there was no intercourse. There was clearly no prejudice to appellant based on the admission of these two aspects of the medical report.

In summary, we hold that the lower court did not clearly abuse its discretion when it declined to exclude the medical report and denied appellant's motion for a mistrial.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**