706 A.2d 628

**Victor Antonio FLORES**

v.

**STATE of Maryland.**

**No. 958, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

March 3, 1998.

174

Richard K. Jacobsen, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Ann N. Bosse, Asst. Atty. Gen., Baltimore (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Jack B. Johnson, State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Submitted before THIEME and BYRNES, JJ., and PAUL E. ALPERT, Judge (retired), Specially Assigned.

THIEME, Judge.

Appellant, Victor Flores, was convicted by a jury sitting in the Circuit Court for Prince George's County (Sothoron, J., presiding) of possession with intent to distribute cocaine, distribution of cocaine, and possession of cocaine. He was sentenced to ten years imprisonment, five years of which was suspended, for the distribution conviction. The remaining convictions were merged for purposes of sentencing. He noted a timely appeal and presents three questions, which we have slightly rephrased:

I. Did the suppression court err in denying appellant's motion to suppress a photograph that was taken of him during an allegedly illegal stop?

II. Did the trial court abuse its discretion in refusing to instruct the jury that mere presence at the scene of a crime is insufficient to prove guilt?

III. Did the trial court err in denying appellant's motion to dismiss for lack of a speedy trial?

## FACTS

On the evening of 19 September 1996, Prince George's County Police Detectives Jennifer Hooper and Christopher Bishop, of the Narcotics Enforcement Division, were traveling in the vicinity of the 1300 block of University Boulevard. At trial, Detective Hooper testified that they were "working an undercover operation in the area targeting street-level drug dealers." The detective explained that on the evening in question, she and Detective Bishop were working in an under-cover capacity, driving an unmarked vehicle, and dressed in street clothes. Detective Bishop was driving the vehicle and Detective Hooper was in the front passenger seat.

Detective Hooper testified that as they traveled an access road in the 1300 block of University Boulevard, she made eye contact with appellant, whom she identified in court. Detec-

tive Hooper was also shown a photograph of appellant and testified that it accurately depicted appellant's appearance on the evening in question. According to the detective, appellant "raised his left hand and flagged [her] over...." Detective Bishop pulled the car to the side of the road. Detective Hooper got out and walked to the front of the vehicle. Appellant approached the detective and she asked him "if he had 20." Detective Hooper explained that by doing so she was using street terminology to request a quantity of crack cocaine. Detective Hooper then gave appellant $20 and received suspected crack cocaine in return. Subsequent laboratory analysis of the item purchased by Detective Hooper determined that it was .10 gram of crack cocaine.

Upon completing the exchange, Detective Hooper returned to the vehicle and handed the crack cocaine to Detective Bishop. Detective Hooper testified that she also watched appellant while Detective Bishop radioed the "stop team" and that she and Bishop drove slowly from the area, keeping appellant in sight at all times until the stop team had detained him. Appellant was not arrested. Detective Hooper explained that under the terms of the police operation they had no intention of arresting appellant that evening.

Detective Bishop also testified that he and Detective Hooper had encountered appellant on the evening in question. According to Detective Bishop, appellant was walking on the sidewalk when he signaled to them to pull to the side of the road. The detective made an in-court identification of appellant as the man who signaled to them and also testified that a photograph of appellant accurately depicted his appearance on the evening in question. This photograph was admitted into evidence.

Detective Bishop further testified that after they pulled to the side of the road Detective Hooper exited the car and Bishop observed the transaction between appellant and Hooper. When Detective Hooper returned to the vehicle, she gave Bishop the crack cocaine she had purchased from appellant. Bishop radioed appellant's location and description to

the stop team, and Detective Bishop drove slowly from the area.

We will include additional facts as necessary in our discussion of the questions presented.

## DISCUSSION

### I.

#### Suppression of the Photograph

This case would have remained a profoundly insignificant one to all except its immediate parties but for the initial question presented, which we now address.

Prior to the start of trial, appellant moved to suppress the photograph of him that was taken by the stop team. Defense counsel set forth a statement of facts in which the State agreed:

> I will recite the facts as I believe they are applicable. I'm basically taking them from the application of the statement of charges. It is my understanding on September 19th, 1996, it is alleged that my client was involved in an undercover sale of narcotics. After that alleged sale took place Officer Warren, whom we have spoken of here today, stopped the defendant and obtained a photograph of him. He was released.
>
> It is my—what the officers and what the State has relayed to me concerning the stop of Mr. Flores is that he was stopped after the sale for identification purposes and he was photographed. There was I believe a pat down of the defendant. Then he was subsequently released.

Counsel then referred to *Evans v. State,* 113 Md.App. 347, 688 A.2d 28, *cert. granted,* 345 Md. 459, 693 A.2d 356 (1997), stating that *Evans* and appellant's case presented "very similar situation[s]" with a "buy/bust operation where a sale would be made [and][a]n officer would take a photograph and then the accused were [sic] arrested at a later time." Counsel alleged that under *Evans,* it was permissible for the police to

take appellant's photograph only if they arrested him. Counsel claimed that since appellant was not arrested, "any seizure that occurred against [appellant's] person is invalid, and therefore that photograph that was seized from my client . . . should be suppressed." Finding that *Evans* was inapposite to appellant's case, the suppression court denied the motion.

Appellant contends:

First, that the trial court erred in denying his motion to suppress as the photograph of him was obtained during an illegal stop. He alleges that even if the officers who stopped him had probable cause to arrest, since there was no arrest, the evidence obtained as a result of the stop, including the photograph of him, should have been suppressed in keeping with this Court's decision in *Evans.*

Secondly, because none of the officers who conducted the stop testified at trial, the photograph should not have been admitted at trial as it constituted hearsay.

The State claims that *Evans* does not apply to appellant's case since the police did not search his person. The State also contends that the seizure of appellant was conducted legally pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and that taking appellant's photograph was not violative of the Fourth Amendment. In the alternative, the State alleges that even if the photograph should not have been admitted into evidence, as Detectives Hooper and Bishop identified appellant in court, any error committed was harmless beyond a reasonable doubt.

 In reviewing the denial of a motion to suppress, we consider only the record of the suppression hearing and not that of the trial itself. *Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749 (1987) (citing *Jackson v. State,* 52 Md.App. 327, 332 n. 5, 449 A.2d 438, *cert. denied,* 294 Md. 652 (1982)); *Aiken v. State,* 101 Md.App. 557, 563, 647 A.2d 1229 (1994), *cert. denied,* 337 Md. 89, 651 A.2d 854 (1995). We extend great deference to the factfinding of the suppression court and accept the facts as found, unless clearly erroneous. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *Perkins v. State,* 83 Md.App.

341, 346–47, 574 A.2d 356 (1990). In addition, we review the evidence in the light most favorable to the prevailing party, the State. *Riddick,* 319 Md. at 183, 571 A.2d 1239; *Cherry v. State,* 86 Md.App. 234, 237, 586 A.2d 70 (1991). Nevertheless, this Court must make its own independent constitutional appraisal by reviewing the law and applying it to the facts of this case. *Riddick,* 319 Md. at 183, 571 A.2d 1239; *Perkins,* 83 Md.App. at 346, 574 A.2d 356.

We reject the Appellant's donnèe. It is undisputed that when he was detained by the stop team, his identity determined, a photograph taken of him, and then released, under *Evans,* he had not been arrested. Appellant is incorrect, however, in concluding that the absence of an arrest requires the suppression of his photograph. *Evans* affects appellant's case only in that it leads us to the conclusion that an arrest cannot serve as a basis to justify the stop made by the police in his case, but *Evans* does not control appellant's case. The suppression court correctly recognized that *Evans* was inapposite to the question before it.

In *Evans,* the defendant was caught in a police operation similar to that in the present case. The operation was designed to identify "street level drug dealers by making 'controlled buys' from them." 113 Md.App. at 351, 688 A.2d 28. One evening during the course of the operation, an undercover police officer purchased $10 worth of cocaine from Evans. The officer had used marked money to make the purchase. When the officer left the scene, he transmitted to a "technical team," by the body wire he was wearing, a description of Evans and his location. 113 Md.App. at 352, 688 A.2d 28. The technical team proceeded into the area and stopped Evans. The undercover officer drove past the scene and positively identified Evans as the man who had sold him the cocaine.

The technical team proceeded to photograph Evans, "tell him that they were conducting an investigation, search him, give him a receipt for the currency which had been seized, and verify his identification." *Id.* at 353, 688 A.2d 28 (footnote

omitted). In the initial search of Evans, the police recovered $163 in currency, but no narcotics. The technical team radioed the undercover officer, who informed them that Evans had produced the cocaine from his "rear area." *Id.* An officer "performed a rectal search of [Evans] and recovered, one by one, nine glass vials of cocaine." *Id.* (Footnote omitted.) Evans was then released. The police officers involved in the operation testified at the suppression hearing that they had no intention of arresting Evans that evening and that they had not arrested him. Evans was arrested one month later when the police returned to the area and made a mass arrest of approximately sixty people.

The suppression court denied Evans's motion to suppress the evidence seized, finding, in relevant part, that Evans had been arrested and that the search had been incident to his arrest. *Id.* at 354, 688 A.2d 28. This Court reversed, holding that a search incident to an arrest cannot be conducted without a valid arrest, which was lacking in Evans's case. We referred to many cases, including *Bouldin v. State*, 276 Md. 511, 350 A.2d 130 (1976), to define arrest:

"It is axiomatic that when the State seeks to justify a warrantless search incident to arrest, it must show that the arrest was lawfully made prior to the search. Of course, *the right to arrest is not equivalent to making an arrest; the record must satisfactorily demonstrate that an arrest was in fact consummated before a warrantless search incident thereto may be found to be lawful.*

It is generally recognized that an arrest is the taking, seizing, or detaining of the person of another (1) *by touching or putting hands on him;* (2) or by *any act that indicates an intention to take him into custody* and that subjects him to the actual control and will of the person making the arrest; or (3) by the consent of the person to be arrested."

113 Md.App. at 359, 688 A.2d 28 (quoting *Bouldin*, 276 Md. at 515–16, 350 A.2d 130 (citations omitted; emphasis supplied)).

We also referred to *McChan v. State*, 238 Md. 149, 207 A.2d 632 (1965), which provides:

> An arrest has been defined as "the detention of a known or suspected offender for the purpose of prosecuting him for a crime." ... [T]here is a detention only when there is a touching by the arrestor or when the arrestee is told that he is under arrest and submits. Where there is no touching, the intention of the arrestor and the understanding of the arrestee are determinative, for in order for there to be an arrest in such case, *there must always be an intent on the part of one to arrest the other* and an intent on the part of such other to submit. When one is approached by a police officer and merely questioned as to his identity and actions, this is only an accosting and not an arrest. *See also* Kauffman, *The Law of Arrest in Maryland*, 5 Md. L.Rev. 125, 131.

113 Md.App. at 360, 688 A.2d 28 (quoting *McChan*, 238 Md. at 157, 207 A.2d 632 (citations omitted; emphasis supplied)).

It is apparent that under *Evans* appellant was not arrested when he was detained by the police officers after selling cocaine to Detective Hooper. This, however, does not end our inquiry in appellant's case, for in *Evans* there was no challenge to the fact that the police had stopped the defendant. Rather, the challenge was brought against the police for conducting a full body search when Evans had not been arrested. Furthermore, in *Evans*, this Court did not address the admissibility of the photograph taken of the defendant. In contrast to *Evans*, appellant was detained briefly, patted down, his identity determined, his photograph taken, and then he was allowed to proceed. He was not subjected to a search. Accordingly, the fact that appellant was not arrested does not require the conclusion that the brief stop conducted by the police in his case was illegal.

The State claims that the stop conducted by the police falls within *Terry*. We agree that the intrusion by the police was no greater than that allowed under *Terry*. Yet, appellant's case does not fall squarely within *Terry*, as the stop was

supported by probable cause, rather than reasonable articulable suspicion, and it was not purely investigatory in nature. In addition, a *Terry* stop is normally conducted to confirm or dispel an officer's suspicions, with an arrest following if the officer's suspicions, supported by the further investigation, rise to the level of probable cause. If these factors were absent, our inquiry would end and we would consider this a proper stop and frisk under the dictates of *Terry*. Nonetheless, we believe that *Terry* and the law that has developed concerning permissible stops of individuals by the police teach us that the brief seizure of appellant's person was not unreasonable.

■ The Fourth Amendment to the Constitution of the United States, made applicable to the States through the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691–92, 6 L.Ed.2d 1081 (1961), guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." We have no doubt that appellant was seized for purposes of the Fourth Amendment when he was detained and photographed by the police. *See Terry*, 392 U.S. at 16, 88 S.Ct. at 1877 (1968) ("Whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."). We must remember, however, "[t]he Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991).

■ In *Terry*, the Supreme Court held that police officers may stop persons to investigate possible criminal activity. 392 U.S. at 21–22, 88 S.Ct. at 1879–80. A valid investigatory stop, commonly called a "*Terry* stop" or "stop and frisk," requires only that "the police have specific articulable facts which, taken together with rational inferences from those facts, create reasonable suspicion that the person has been or is about to be involved in criminal conduct." *Aguilar v. State*, 88 Md.App. 276, 281, 594 A.2d 1167 (1991). Reasonable

suspicion is " 'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911 (1996)(quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). *See also Derricott v. State,* 327 Md. 582, 587, 611 A.2d 592 (1992) (police officer may stop a suspect "if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot").

 In the present case, the actions of the police were based upon probable cause, a higher standard than that of reasonable articulable suspicion. *See Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990) ("reasonable suspicion can arise from information that is less reliable than that required to show probable cause"); *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) ("the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause"); *Baziz v. State,* 93 Md.App. 285, 293, 612 A.2d 296 (1992), *cert. denied,* 329 Md. 110, 617 A.2d 1056 (1993) ("The quantity and quality of evidence required to create reasonable suspicion under the stop and frisk exception to the Fourth Amendment warrant requirement is significantly less than that required to show probable cause...."). It is absurd that a *Terry*-type stop, based upon the higher standard of probable cause regarding commission of a crime, would not also be permitted.

In *Price v. State,* 227 Md. 28, 175 A.2d 11 (1961), the police received a call about a prowler. They responded to the scene and found Price in the vestibule of an apartment building. Price had entered the building's outer door and was facing its inner door, on which pry marks were visible. The police asked Price if he lived in the building, he mumbled an unintelligible reply,and hurried away. The police pursued Price and a struggle ensued with the officers eventually taking him into custody. The Court discussed but did not decide a question briefly raised by Price:

One question which is suggested or touched upon rather lightly in the appellant's brief, but is not discussed by the State's brief, is whether or not there is a right to detain for questioning a person found in such suspicious circumstances as those in which the appellant was found. Inferentially, the learned trial judge seems to have been of the opinion that the officers could detain the appellant for an explanation on the spot. Certainly, this would be less drastic than an actual arrest and, presumably, less objectionable from the appellant's point of view. There seems, however, to be no decision of this Court with regard to a right of police officers to detain a suspect for questioning without an actual arrest (but see Kauffman's comment in *The Law of Arrest in Maryland,* 5 Md. L.Rev. 125, 159 (rule 5)); and we find it unnecessary here to undertake to decide such a question, *for if the facts would justify an arrest, a fortiori, they would justify a detention for questioning.*

227 Md. at 34, 175 A.2d 11 (emphasis added). Although decided before *Terry, Price* demonstrates an argument based on pure logic—if the police possess probable cause to arrest an individual, that probable cause would also support a brief on-the-spot detention to question the individual. This is the factual scenario present in appellant's case; however, in *Price,* as in a typical *Terry* stop where the officers' suspicions are confirmed, the suspect was arrested. We must, therefore, consider the nature and scope of the conduct of the police during the brief seizure of appellant's person.

 There are limits placed upon the scope of the police intrusion during a *Terry* stop with the conduct of the police being "tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879 (footnote omitted). "The reasonableness of an intrusion is to be assessed against an objective standard—whether 'the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate.'" *Anderson v. State,* 282 Md. 701, 705, 387 A.2d 281 (1978) (quoting *Terry,* 392 U.S. at 21–22, 88 S.Ct. at

1880). The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). In addition, "if there is also an articulable basis for a reasonable belief that the suspect may be armed, the officer may 'frisk' him, that is, pat-down the exterior of the suspect's clothing to insure that he is not armed. That intrusion, too, is a reasonable one, for the protection of the officer." *Weedon v. State,* 82 Md.App. 692, 696, 573 A.2d 92 (1990).

 Furthermore, the nature of a *Terry* stop is investigatory. *Dennis v. State,* 342 Md. 196, 205, 674 A.2d 928, *vacated on other grounds,* —— U.S. ——, 117 S.Ct. 40, 136 L.Ed.2d 4 (1996). In *Dennis,* the Court of Appeals explained:

> [A *Terry* stop] is justified on the basis of the general interest in "effective crime prevention and detection." *Terry,* 392 U.S. at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. The rationale underlying a *Terry* stop is that, when the circumstances are appropriate, a police officer may stop a person "for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.* at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906–07 Whether appropriate circumstances exist depend upon "the facts and circumstances . . . detailed before the trial judge . . ." and whether a reasonably prudent person would have concluded that, under those circumstances, a detention for further investigation was justified. *Id.* at 28, 88 S.Ct. at 1883, 20 L.Ed.2d at 910. Because the purpose of the stop is investigatory and must be justified by the facts and circumstances detailed to the court, it follows that the police officer must intend that the stop be investigatory and the stop, in fact, must be for that purpose.

*Dennis,* 342 Md. at 205, 674 A.2d 928.

> The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary

to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

*Royer,* 460 U.S. at 500, 103 S.Ct. at 1325–26 (citations omitted). Nonetheless, the permissible investigatory actions of the police during a *Terry* stop are not limited to merely questioning the detained individual:

It is clear that there are several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop. The most common is interrogation, which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained, but the officer may also or instead conduct a non-search examination of the suspect's person, car, or objects he is carrying, or may compare the suspect's shoes with prints at the nearby crime scene.... Sometimes the officer will communicate with others, either police or private citizens, in an effort to verify the explanation tendered, to determine if certain property in possession of the suspect has been stolen, or to confirm the identification or determine whether a person of that identity is otherwise wanted. Or, the suspect may be detained while it is determined if in fact an offense has occurred in the area, a process which might involve checking certain premises or vehicles, locating and examining objects abandoned by the suspect or otherwise lawfully discovered, or talking with other people. If it is known that an offense has occurred in the area, the suspect may be viewed by witnesses to the crime. There is no reason to conclude that any investigative methods of the type just listed are inherently objectionable; they might cast doubt upon the reasonableness of the detention, however, if their use makes the period of detention unduly long.

Wayne R. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment,* § 9.2(f) at 51–58 (1996) (footnotes omitted).

Here, the detention of appellant was a very limited intrusion. It lasted only as long as necessary for the police to learn his identity and photograph him. That was the intent of the stop at its inception and it was not broadened to anything further.

Although the nature and scope of the intrusion was clearly no more than that permitted under *Terry*, it was not wholly investigatory in nature—appellant had already committed the crime in question and the police had probable cause to arrest him. *Terry*, however, was based, in part, upon the need for greater flexibility by the police in developing new investigative techniques. In *Gibbs v. State*, 18 Md.App. 230, 306 A.2d 587, *cert. denied*, 269 Md. 759 (1973), this Court discussed the then recent *Terry* decision, with Judge Moylan writing:

In *Terry*, the Supreme Court expressly recognized that it was attempting to strike a balance between the necessity for some flexibility in permitted police behavior in the investigation and in the prevention of crime, on the one hand, and the rights of citizens to be free from unreasonable governmental intrusion, on the other hand. The Supreme Court lucidly described the Scylla and the Charybdis between which it would attempt to chart its perilous course. It recognized first the practical needs of police routine:

" ... [I]t is frequently argued that in dealing with the rapidly unfolding and often dangerous situations on city streets the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess. For this purpose it is urged that distinctions should be made between a 'stop' and an 'arrest' (or 'seizure' of a person), and between a 'frisk' and a 'search.' Thus, it is argued, the police should be allowed to 'stop' a person and detain him briefly for questioning upon suspicion that he may be connected with criminal activity. Upon suspicion that the person may be armed, the police should have the power to 'frisk' him for weapons.' " 392 U.S. at 10, 88 S.Ct. at 1874.

It juxtaposed the liberties of the citizens:

" . . . The heart of the Fourth Amendment, the argument runs, is a severe requirement of specific justification for any intrusion upon protected personal security, coupled with a highly developed system of judicial controls to enforce upon the agents of the State the commands of the Constitution. Acquiescence by the courts in the compulsion inherent in the field interrogation practices at issue here, it is urged, would constitute an abdication of judicial control over, and indeed an encouragement of, substantial interference with liberty and personal security by police officers whose judgment is necessarily colored by their primary involvement in 'the often competitive enterprise of ferreting out crime.' . . . This, it is argued, can only serve to exacerbate police-community tensions in the crowded centers of our Nation's cities." 392 U.S. at 11–12, 88 S.Ct. at 1874–75.

18 Md.App. at 235–36, 306 A.2d 587 (footnote omitted).

■■■ Appellant was caught in a somewhat novel approach by the police in their seemingly fruitless attempt to cleanse a community of its drug cancer and those purveyors of sewage who are heaping up sordid dollars. In considering the need for new police techniques to counter the constantly mutating nature of crime, we will not conclude that the brief detention based upon probable cause was unreasonable. The solitary purpose of this approach was to determine the appellant's identity and to photograph him, so that he could be identified, arrested, and charged at a later date, while protecting a broader, ongoing undercover operation. There is not a whisper that the stop of the appellant was connected with other criminal activity for which he may have been under investigation. In addition, although *Terry* justifies an intrusion when it reasonably appears that criminal activity may be afoot, this concept has been expanded to include suspicion of criminal activity that may occur on some later occasion, *see United States v. Feliciano*, 45 F.3d 1070 (7th Cir.), *cert. denied*, 516 U.S. 853, 116 S.Ct. 153, 133 L.Ed.2d 97 (1995) (officers could stop two individuals who were suspected of having attempted to lure a man to an embankment to mug him even though the

two individuals began to walk home as they might try to rob some other passerby), and to justify a stop based upon past criminal activity. *See United States v. Hensley,* 469 U.S. 221, 228, 229, 105 S.Ct. 675, 680–81, 83 L.Ed.2d 604 (1985) (although recognizing that "[t]he precise limits on investigatory stops to investigate past criminal activity are more difficult to define[,]" the Court concluded that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion"); *State v. Blackman,* 94 Md.App. 284, 290–91, 617 A.2d 619 (1992) (*Terry* stop to investigate whether there was outstanding warrant for suspect's arrest was proper).

In sum, as the police had probable cause to believe that appellant had committed a crime, but, due to an ongoing operation, did not wish to arrest him immediately following its commission, a brief detention to determine and immortalize an individual's identity by photographing him, to ensure that the correct individual would later be arrested, was not unreasonable. The suppression court committed no error in denying appellant's motion to suppress the photograph taken by the police.

Finally, we must note that in *Evans,* this Court, relying on *People v. Evans,* 43 N.Y.2d 160, 400 N.Y.S.2d 810, 371 N.E.2d 528 (1977), recognized a potential abuse by the police if we determined that the search in that case had been incident to Evans's arrest. The New York case involved a fact pattern nearly identical to that present in the Maryland case, and we quoted liberally from the New York Court of Appeals opinion, which commented, in part:

"To adopt the proposition that the search was valid because there was probable cause to arrest puts the cart before the horse. *An arrest is an essential requisite to a search incident,* otherwise once probable cause existed a potential arrestee would be fair game for any intrusions the police deem appropriate for however long they allow him to remain at large. While it has been consistently held that

there is no constitutional right to be arrested, the police may not utilize the existence of probable cause as a trump card to justify warrantless personal searches. *Unless and until a person is arrested, a full body search* without a warrant or exceptional circumstances *is constitutionally unreasonable."*

113 Md.App. at 363, 688 A.2d 28 (quoting *People v. Evans,* 400 N.Y.S.2d at 813, 371 N.E.2d 528 (citations omitted; emphasis supplied)).

 Such a concern is not present under the facts in the case before us. Appellant was not searched, no contraband was seized from his person, and the stop was limited to determining his identity.[1] The stop, although based upon probable cause, is circumscribed by the bounds of *Terry* concerning its nature, scope, and duration. *See generally Royer,* 460 U.S. at 500, 103 S.Ct. at 1325 (detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop"); *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879 (determining the reasonableness of the search and seizure depends upon "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place"). Once the police determined appellant's identity, had taken his picture in conformance with their ongoing operation, and then permitted him to proceed, appellant's sale of cocaine to Detective Hooper provided no further grounds for the police to again stop him other than to effect an arrest.

---

1. Appellant was also patted down during the detention, but the permissibility of that police conduct is not before this Court. We do note that under *Terry,* if a suspect is properly detained and the police also have reasonable suspicion that the suspect is armed, it would be permissible for the police to pat down the suspect to ensure officer safety. *See Weedon v. State,* 82 Md.App. 692, 696, 573 A.2d 92 (1990) (during a *Terry* stop, officer may pat down the exterior of the suspect's clothing to insure that he is not armed if the officer has an articulable basis for a reasonable belief that the suspect may be armed). A search, however, would not be permissible unless the suspect was arrested. *Evans, supra.*

■ Appellant also alleges that the photograph constituted inadmissible hearsay. Appellant failed to present this argument to the trial court and, as a result, has failed to preserve it for our review. *See White v. State,* 324 Md. 626, 640, 598 A.2d 187 (1991) (argument not made below is not properly before appellate court); *Kanaras v. State,* 54 Md.App. 568, 573, 460 A.2d 61, *cert. denied,* 297 Md. 109 (1983) (appellant cannot present claim for the first time on appeal).

We now address the appellant's remaining two questions, which can be quickly disposed.

## II.

### Jury Instructions

■ After the court instructed the jury, defense counsel requested an additional instruction—that mere presence at the scene of the crime is insufficient to prove guilt—and the following exchange occurred:

[DEFENSE COUNSEL]: I will just ask for one additional instruction.... I wanted an instruction concerning the presence, the mere presence of the defendant at the scene, that that is not—just because he is present doesn't necessarily mean that he is guilty of what is alleged.

THE COURT: All right.

[DEFENSE COUNSEL]: I think it is appropriate for you to make that instruction.

[STATE'S ATTORNEY]: I would object to that. There has been no offering of a defense that he was there, that he wasn't there.

THE COURT: That is true, [Defense Counsel]. In this particular case it is not like he was there but they misidentified him.

[DEFENSE COUNSEL]: That is what the defense is.

THE COURT: Where is there evidence that he was present other than as being the principal in this case?

[DEFENSE COUNSEL]: I—

THE COURT: I would agree a hundred percent that your defense may be well taken if there was somebody who testified, well, he was there, he lived in the area, but he just wasn't the person who committed the offense.

[DEFENSE COUNSEL]: If it is the State's position I have to generate that that he wasn't, I don't think it is necessary to generate the fact, or the inference that he wasn't involved in it. I don't think it prejudices the State in any way. In the interest of fairness of anyone being on the scene doesn't necessarily mean that they committed that offense.

THE COURT: Based upon the facts obviously it is an all or nothing situation that will fall on the identification issue. I certainly emphasized that in strong language to the jury.

[DEFENSE COUNSEL]: Please note my exception as far as that is concerned.

THE COURT: It is noted. Thank you very much.

Appellant contends that the trial court abused its discretion in declining to instruct the jury that mere presence at the scene of a crime is insufficient to prove one's guilt. He claims that, since the defense theory of the case was that no pre-marked money, which was allegedly given to appellant in the transaction, was recovered and none of the officers who stopped him and patted him down testified at trial, a reasonable doubt existed as to whether appellant was the person who had sold the crack cocaine to Detective Hooper, and he was thus entitled to this instruction.

Maryland Rule 4–325(c) provides:

The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

This rule "has been interpreted to require that a requested instruction be given only when there is evidence in the record to support it." *Hof v. State,* 337 Md. 581, 612, 655 A.2d 370 (1995). As a result, "to merit an instruction, the issue as to which the request is made must have been generated by the evidence adduced." *State v. Martin,* 329 Md. 351, 357, 619 A.2d 992, *cert. denied,* 510 U.S. 855, 114 S.Ct. 161, 126 L.Ed.2d 122 (1993). *See also Davis v. State,* 104 Md.App. 290, 293, 656 A.2d 326 (1995) (citing *Dillon v. State,* 277 Md. 571, 584, 357 A.2d 360 (1976)) ("It is incumbent upon the trial court, on request in a criminal case, to give an advisory instruction on every point of law essential to the crime charged and supported by evidence.").

The Pattern Jury Instruction regarding the presence of the defendant at the scene of the crime provides:

> A person's presence at the scene of a crime, without more, is not enough to prove that the person committed a crime. The fact that a person witnessed a crime, made no objection or did not notify the police does not make that person guilty of a crime. However, a person's presence at the time and place of the crime is a fact in determining whether the defendant is guilty or not guilty.

Maryland Pattern Jury Instructions—Criminal, § 3:25 at 84 (1995).

The facts of this case demonstrated only that appellant was the individual who sold the drugs to Detective Hooper and that she kept appellant in sight until he was approached by the stop team. The State did not rely on circumstantial evidence in proving its case, which, coupled with appellant's presence at the scene of the crime, would have been considered by the jury in determining appellant's guilt. The jury was not required to consider appellant's presence at the scene in light of circumstantial evidence of his guilt in reaching a verdict. *Cf. Creighton v. State,* 70 Md.App. 124, 131, 520 A.2d 382 (1987) (citation omitted) ("Presence near the scene of a crime 'when coupled with other suspicious circumstances may be enough to base a conviction upon circumstantial evi-

dence.' "); *Govostis v. State,* 74 Md.App. 457, 468, 538 A.2d 338, *cert. denied,* 313 Md. 7, 542 A.2d 844 (1988) (defendant may be identified as an accomplice by showing he was in the company of the perpetrators in the vicinity of the crime at about the time the crime was committed). All of the evidence demonstrated appellant's direct participation in the crimes charged. The trial court committed no error in declining to give the requested jury instruction. In addition, the court's instructions clearly conveyed to the jury that in order to convict appellant it had to find that he had committed the crimes in question.

### III.

■ Appellant was arrested on October 1, 1996, and brought to trial on April 22, 1997. Prior to the start of trial, he moved to dismiss the charges against him for lack of a speedy trial. In denying appellant's motion, the trial court analyzed the factors set forth in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), and, in denying appellant's motion, noted, *inter alia,* that there was no substantial delay in bringing appellant to trial.

■ Appellant contends, without argument, that the trial court erred in denying his motion. As appellant presents no argument in support of his position, this question is not properly before us. *See* Md. Rule 8–504(a)(5) (a brief shall contain "[a]rgument in support of the party's position"); *Oaks v. State,* 83 Md.App. 1, 5, 9, 573 A.2d 392 (1990) (declining to address alleged errors as appellant presented no argument in support of his position). In any event, we hold that the trial court committed no error, as the length of the delay, six months and twenty-one days, was not of constitutional dimension such that it would trigger the *Barker* analysis. *See Barker,* 407 U.S. at 530, 92 S.Ct. at 2192 ("Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."); *Epps v. State,* 276 Md. 96, 109, 345 A.2d 62 (1975) (the length of the delay "requires a computation from the date on which

the defendant became 'an accused,' from the date he was subjected to 'actual restraints imposed by arrest and [held] to answer [the] criminal charge'... up until the date his case was tried...."); *Tapscott v. State,* 106 Md. App. 109, 125, 664 A.2d 42 (1995), *aff'd,* 343 Md. 650, 684 A.2d 439 (1996) (delay of seven months and a few days is not of constitutional dimension).

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**